**Samuel ALEXANDER,**
**Petitioner-Appellant,**

v.

**Harold J. SMITH, Superintendent, Attica**
**Correctional Facility,**
**Respondent-Appellee.**

**No. 732, Docket 78–2007.**

United States Court of Appeals,
Second Circuit.

Argued May 9, 1978.

Decided Aug. 7, 1978.

Benjamin I. Cohen, New York City (Poletti, Freidin, Prashker, Feldman & Gartner, Stanley Futterman, New York City, of counsel), for petitioner-appellant.

Tyrone Mark Powell, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondent-appellee.

Before WATERMAN, INGRAHAM * and MANSFIELD, Circuit Judges.

WATERMAN, Circuit Judge:

This is an appeal from a judgment order of the United States District Court for the Western District of New York, Curtin, *J.,* denying without an evidentiary hearing a petition seeking the issuance of a writ of habeas corpus. Assigned counsel has done an admirable job briefing and arguing this appeal but, inasmuch as we find no error in Judge Curtin's decision or reasoning, we affirm.

On August 24, 1971 a Brooklyn, New York supermarket was robbed and the assistant manager, Thomas Higgins, was shot to death during the course of the robbery. At about 6:30 a. m. on September 8, 1971, the police arrested one Robert Smith for the murder of Higgins and upon his arrest Smith immediately confessed and implicated Alexander, the petitioner-appellant here, in the robbery and murder. Acting upon the information so received and other information as well, the police, with Smith present to identify the apartment where Alexander resided, went directly to Alexander's apartment and arrested him there at approximately 7:30 a. m. As he was being taken into custody, Alexander, who in view of a number of previous arrests was probably well-acquainted with what should be done in such a situation, instructed his wife to call his attorney. The police officer told Alexander's wife that Alexander would be taken to the 73rd Precinct.[1] Upon arrival

---

* Of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. There was conflicting evidence on the issue of whether the police had assaulted Alexander at the time of his arrest. Both Alexander and Smith testified that the police had done so. Mrs. Alexander, had she testified at the hearing on Alexander's pretrial motion to suppress, would have corroborated the story related by Alexander and Smith. The arresting officers, however, testified that Alexander had not been beaten. The state trial court judge, as was his right to do as the assessor of credibility, chose to believe the officers' version.

As will appear later in this opinion, no attorney sought to consult with Alexander once he had been taken to the 73rd Precinct stationhouse. Mrs. Alexander did contact an attorney who said that he would undertake to represent Alexander if Mrs. Alexander could obtain enough money to pay him. Following this de-

at the 73rd Precinct stationhouse, contrary to standard practice, Alexander was not immediately booked but was instead taken to a detention cell. At about 10:30 a. m. one of the arresting officers, a Detective Schneider, took Alexander to a bathroom. Upon returning to the detention pen, while walking through the police locker room, Alexander indicated that he wished to discuss his situation with the officer. Detective Schneider then read Alexander his *Miranda* rights, among which were included his rights to be represented by an attorney, to have counsel present during any interrogation, and to have an attorney appointed for him if he could not afford one. As Alexander was being advised of each distinct right, Detective Schneider asked Alexander whether Alexander understood each of these rights. Each time he was so asked, Alexander nodded his head in the affirmative. After being advised of his rights, Alexander was asked whether he still wished to make a statement without counsel being present. After again indicating that his response was in the affirmative, Alexander asked "What am I here for?" In response the detective stated that Alexander was being held "for the Bohack killing." Alexander thereupon exclaimed: "My gun wasn't popping. Gene's was." He thereby implicated himself in the robbery and murder at the supermarket in Brooklyn. When Detective Schneider notified a second officer, Detective Cambridge, as to what had occurred, the latter entered the locker room

and again informed Alexander of his *Miranda* rights. Again choosing to waive those rights, Alexander once more implicated himself in the crime by telling Detective Cambridge: "All right, you have got me and you have got the little guy. I know the little guy gave me up." After further probing the officer's knowledge concerning the circumstances surrounding the commission of the crime, Alexander further stated, in substance, according to Detective Cambridge, that "[t]wo of Gene's regular partners had to go south for a funeral, and Gene said to me and the little guy we didn't have to do anything, one of us would stand by the door and the other would take the registers." [2]

Following ten hours during which he might have received only a minimal amount of food or drink while being held in the detention cell but during which time he had not been subjected to any further interrogation,[3] Alexander was again questioned on September 8, this time at 9 p. m. that evening by Assistant District Attorney DiBenedetto. The state prosecutor again read Alexander all of his *Miranda* rights. Alexander was then asked if he understood each right and in each instance he replied "Yes." Alexander then asked, "You said that if I wanted an attorney present, that's my right to have an attorney present[?]" DiBenedetto responded, rather obliquely, that Alexander himself could decide whether he wished to provide any answers to any of the prosecutor's questions. An off-the-

mand for payment, Mrs. Alexander did not contact this attorney again.

2. Volume I, Transcript of Pretrial Hearing, at pg. 618.

3. It is clear that Alexander did not dine lavishly during his detention on September 8. Beyond that, there is some conflict as to the food and beverages he did receive. At the pretrial hearing held to consider Alexander's motion to suppress the incriminating remarks and confessions he had made to the police and the prosecutor at the 73rd Precinct stationhouse, the state trial court judge made no explicit finding on this matter. However, the state court judge's findings that there had been no duress and that "there was no merit to defense contentions made during the course of the hearing that the defendant, either because of his drug

habit or *for any other reason*, was unable to understand the proceedings," (emphasis supplied) seem to foreclose any argument that, based on any testimony at the hearing, Alexander had been underfed and thereby enervated, so that the confession he ultimately made to Assistant District Attorney DiBenedetto was involuntary. Moreover, at the pretrial suppression hearing one of the detectives who was supervising Alexander testified that the prisoner had been given some chicken. Alexander testified at the hearing in state court that an officer had, at Alexander's request, given him a pack of cigarettes and, before Judge Curtin, Alexander acknowledged that he had been given "a cup of coffee and a small piece of cake," (District Court Opinion, at pg. 12) during the course of the day.

record discussion followed and immediately thereafter, Alexander said: "Pop your questions." This the assistant district attorney forthwith proceeded to do. In response to DiBenedetto's questions, Alexander gave an extremely comprehensive statement which fully implicated him in the robbery and murder at the Bohack's supermarket in Brooklyn.[4]

Alexander was finally booked at 11 p. m. that same evening and he was arraigned on a felony murder charge the following day. Indictment followed on September 11, 1971. On September 15, 1971, counsel was appointed to represent him.

In accordance with the requirements of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), a pretrial hearing (hereinafter the "*Huntley* hearing") on Alexander's motion to suppress the two incriminating statements he had made to the detectives and the detailed confession he had made to the assistant district attorney was held from February 15, 1972 through February 22, 1972 before Justice Joseph Mollen of the New York State Supreme Court, Kings County. At the close of this protracted hearing, Alexander sought to reopen the record so that he could introduce the testimony of two additional witnesses, that of his wife and that of his father-in-law, German, both of whom had been previously unavailable because they had been attending the out-of-state funeral of a member of the family. In refusing to permit Mrs. Alexander to corroborate her husband's testimony that he had been beaten at the time of his arrest, Justice Mollen stated that the wife's testimony would have been merely cumulative to that given by Alexander and would not have been relevant to the issue of voluntariness inasmuch

as there was no indication that petitioner had confessed as a result of the alleged blows inflicted by the police at the time of Alexander's apprehension at his apartment at about 7:30 a. m. on the morning of September 8, 1971. *See* note 1 *supra*. As to the proffered testimony of Alexander's father-in-law that, upon appearing at the 73rd Precinct house during the day of September 8, 1971, he had been informed that Alexander was not at the stationhouse, when, in fact, Alexander was being held in a detention cell upstairs, Justice Mollen ruled that such testimony would be hearsay and "would not [, in any event,] have any real bearing on the issues before the Court" in the *Huntley* hearing.

The state trial court judge then read into the record his detailed findings of fact and conclusions of law. Justice Mollen found that Alexander had been adequately advised of his *Miranda* rights and had knowingly and intelligently waived them. The judge also found that all of Alexander's statements were fully voluntary and that "no force, no duress, no coercion, no violence" had been used by the police or the prosecutor to compel Alexander to make any statements to the detectives or to the assistant district attorney.

Alexander's trial in the New York State Supreme Court, Kings County, on a charge of felony murder commenced on February 28, 1972. On the second day of trial Justice Mollen reversed his earlier determination, made at the *Huntley* hearing, and ruled that the first statement Alexander had made to the police in the locker room on the morning of the 8th of September would be excluded inasmuch as Alexander's "nodding" after each question posed to him by Detective Schneider might not have been an adequate enough indication of an intention to waive his *Miranda* rights.[5] The

---

4. *See* Appendix to this opinion.

5. The Court: Now, before we proceed with the opening statements, so there's no misunderstanding, I'm going to make a ruling at this time. On Monday of this week I made a ruling with regard to the Wade-Miranda aspects. In the course of that ruling I ruled on five separate aspects. As both of you will

recall, I'm certain, I ruled on the question of the identification testimony of the witnesses John Lopez and Lester Wittaker and on the admissibility of certain alleged admissions which were alleged to have been made by this defendant, three in number—one to Sergeant Schneider, one to Detective Cambridge

second statement, that which was made to Detective Cambridge immediately following the initial statement to Detective Schneider, was not introduced by the prosecution during its case-in-chief, and the state trial judge refused to allow the statement to be introduced at the end of the government's case inasmuch as Justice Mollen found that Alexander could not, at that point anyway, have conducted an effective cross-examination. However, the third statement, the statement made to Assistant District Attorney DiBenedetto, was received. On March 3, 1972, Alexander was convicted, as charged, of the felony murder and, as a result of his conviction, was eventually sentenced to a prison term of 20 years to life. The Appellate Division of the New York State Supreme Court, Second Department, affirmed the judgment of conviction in a short *per curiam* decision, *see People v. Alexander*, 45 App.Div.2d 1023, 358 N.Y. S.2d 68 (2d Dep't 1974), confining its discussion to Alexander's contention that he had not waived his right to counsel at the time he spoke to the assistant district attorney. Rejecting the claim, the Appellate Division expressly ruled that DiBenedetto's nonresponsive answer had not been coercive or deceptive and the court therefore concluded that the answer did not impact upon what was otherwise a clear waiver of Alexander's right to counsel. On October 25, 1974, the

New York Court of Appeals denied leave to appeal.

On February 11, 1975 Alexander filed with the United States District Court for the Western District of New York a *pro se* petition seeking the issuance of a writ of habeas corpus. In February 1976 counsel was appointed to represent Alexander and an amended habeas corpus petition was filed with the district court on March 24, 1976. After an independent review of the transcript of the *Huntley* hearing, the trial transcript, the briefs and other records of trial and appeal, United States District Judge John T. Curtin, in a decision dated November 4, 1977, concurred in the state trial court's findings. Judge Curtin recognized that the findings of the state court are presumptively correct and, inasmuch as his own review of the record of the *Huntley* hearing had not disclosed any reason for ignoring the state trial court judge's determinations, the federal district judge accorded them the standard deference to which they are statutorily entitled; indeed, Judge Curtin indicated that Justice Mollen's findings were amply supported by the record made during the *Huntley* hearing. Judge Curtin thus concurred in the state trial judge's conclusion that under the "totality of the circumstances" test, Alexander's statements were neither coerced nor obtained by means of physical violence. Accord-

---

and one in the form of a question-and-answer statement to Assistant District Attorney DiBenedetto—and, in the Court's rulings, I ruled that the identification testimony would be admissible as to both identifying witnesses and that all three statements would be admissible in the People's case. That is the statements made allegedly by this defendant to Sergeant Schneider, Detective Cambridge and Assistant District Attorney DiBenedetto [*sic*]. I've given further thought and consideration to those rulings. Now, on the basis of my further reflection upon the issues therein, the Court has determined that with regard to the statement which allegedly was made to Sergeant Schneider wherein the alleged waiver of the defendant's constitutional rights consisted of the nodding of his head in an affirmative manner, the Court is of the view that this is an extremely close question, that *the Court still feels that the statement was made by the defendant without deprivation of any of his constitutional rights under*

*Miranda*, but that nevertheless the question is so close in this instance the Court has reservations about the People having met what the Supreme Court of the United States calls the heavy burden of proving a knowing and intelligent waiver in that particular regard. Under the circumstances, the Court rules that the statement allegedly made by the defendant to Sergeant Schneider is inadmissible and the motion to suppress such statement is granted. Lest there be any confusion about the Court's ruling, Mr. Schwartz, I want to make clear that this is not in any way to be deemed an anticipatory ruling in regard to anything that might occur during the course of the trial which might be in the purview of the case of Harris against New York, by the Supreme Court of the United States, or the People against Kulis in our own Court of Appeals.

Volume I, Trial Transcript, at pp. 23–25 (emphasis supplied).

ingly, Judge Curtin determined that no purpose would be served by holding a further evidentiary hearing in the federal court to determine whether Alexander's statements had been extracted from him through the use of physical coercion. The federal district judge also determined that the state trial court was correct in its ruling regarding the exclusion of the testimony that would have been given by Alexander's wife. Judge Curtin also seems to have accepted as true the facts to which Alexander claims German would have testified. Finally, the district judge rejected all of Alexander's claims based upon alleged abridgements of his fifth and sixth amendment rights.

Following Judge Curtin's issuance of a certificate of probable cause, Alexander filed a notice of appeal from the district court's decision denying the petition for the issuance of a writ of habeas corpus.

Alexander advances two grounds upon which he claims the state trial court judge should have suppressed his third confession. He argues first that that confession was inadmissible on fifth amendment grounds because it was involuntary, and he contends, in the alternative, that it should have been excluded on sixth amendment grounds since it was procured in derogation of Alexander's right to counsel. We discuss these claims seriatim.

Alexander's claim that his third confession was involuntarily extracted from him in violation of his fifth amendment rights need not detain us long. In his detailed findings of fact and conclusions of law the state trial judge explicitly found that under the totality of the circumstances Alexander's confession to Assistant District Attorney DiBenedetto was voluntary. This finding of fact is, of course, entitled to a presumption of correctness, 28 U.S.C. § 2254(d); *accord, Tanner v. Vincent*, 541 F.2d 932, 937 (2d Cir. 1976), *cert. denied*, 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782 (1977), unless one of the eight exceptions specified in 28 U.S.C. §§ 2254(d)(1)-(8) can be shown to exist or unless Alexander can bear "the burden of establishing by *convincing* evidence that the findings of fact

by the state court are erroneous." *Tanner v. Vincent, supra*, 541 F.2d at 937 (emphasis supplied). Alexander does not predicate his appeal on a direct attack to any substantial extent on Justice Mollen's finding of voluntariness. Instead, relying upon three of these eight exceptions Alexander argues that the state trial court's finding that his third confession, the one given to the state prosecutor, was a voluntary confession should not be presumed to be a correct finding. First, Alexander contends that, inasmuch as the state trial court judge made no specific and explicit finding that the third confession was not fatally "tainted" by the first confession, "the merits of the factual dispute were not resolved in the State court hearing." 28 U.S.C. § 2254(d)(1). Second, he asserts that he was not afforded a full and fair hearing in the *Huntley* hearing conducted by the state court, *see* 28 U.S.C. §§ 2254(d)(2), (6), because the state trial court judge refused to reopen that hearing to allow Alexander's wife and father-in-law to give the testimony to which we have already referred.

■ We find that these exceptions to the presumption of correctness do not apply here. Alexander places himself between the proverbial rock and a hard place in attempting to capitalize on the state trial court's failure to make a specific finding (as a prelude to its finding that Alexander's third confession was voluntary) that the third confession was not tainted by the initial statement given to Detective Schneider. On the one hand, if the claim that there was a fatal taint constitutes a separate and distinct claim (apart from the more general claim that his confession was involuntary) upon which an explicit finding should have been made in order for the state trial court's determination to be entitled to the statutorily prescribed presumption of correctness, then Alexander may not present this issue to us because it was not presented as a distinct claim in either the state courts or in the federal district court below. As to the failure to preserve the claim in the state courts, the claim would not have been exhausted, *United States ex*

*rel. Springle v. Follette*, 435 F.2d 1380, 1384 (2d Cir. 1970), *cert. denied*, 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 331 (1971); as to the latter failure, we sit as an appellate court to review the actions of the federal trial courts and we do not consider claims not raised below. *Jennings v. Casscles*, 568 F.2d 229, 233–34 (2d Cir. 1977); *United States ex rel. Springle v. Follette, supra*, 435 F.2d at 1384. On the other hand, if as is more likely, the "taint" claim is not a separate claim at all but is, instead, a claim encompassed within the broader claim that the third confession was involuntarily given, then the issue of possible taint must have been subsumed within the broader issue of whether Alexander's confession to DiBenedetto was voluntary, and we have no reason to doubt that the state trial court judge, in adhering at trial to his pretrial ruling that the *third* confession *was* voluntary, did so rule while being fully cognizant of the well-recognized principles proscribing prosecutorial use of the fruit of the poisonous tree. In this connection we note that even if Alexander's first statement to the police officers on the morning of the 8th of September was taken in violation of his *Miranda* rights, which the state trial court judge somewhat cryptically intimated was not so,[6] the third confession *could* nonetheless still be voluntary in view of the totality of the circumstances, *see, e. g., Tanner v. Vincent, supra*, 541 F.2d at 936; *Jennings v. Casscles, supra*, 568 F.2d at 232–33, and, under these circumstances we would hold, if need be, that the confession given to the state prosecutor was indeed a voluntary one despite what we may assume *arguendo* was Alexander's earlier ineffectual waiver of his *Miranda* rights.

We also reject Alexander's claim that we should ignore the presumption of the correctness of the state court's findings inasmuch as the state court supposedly did not afford Alexander a full and fair hearing on the issue of the voluntariness of his confession to DiBenedetto. The state trial court judge found, Judge Curtin agreed with him, and we agree with both of them, that Mrs. Alexander's proposed testimony, which would have been confined to a statement that she had observed her husband being beaten at the time of his arrest at their apartment, would not have affected the judge's conclusion that the third confession was voluntarily given. In view of her obvious bias and because Alexander and Smith had already testified to that very thing, it is clear that her testimony had no substantial probative value on the question of whether the police had physically abused Alexander at the time of his arrest. With reference to German's proposed testimony that the desk sergeant at the 73rd Precinct denied that Alexander was being held there, it is true that such testimony conceivably might have been of somewhat more utility in establishing Alexander's case than Mrs. Alexander's testimony would have been, since it could have been taken as some possible indication that the police were intentionally and malevolently attempting to conceal Alexander's whereabouts so that they could "drill him" until he had confessed. Yet, Justice Mollen, the state trial court judge presiding at Alexander's suppression hearing and trial, clearly stated that in the context of the other substantial evidence before him, German's proposed testimony would not have affected his ultimate conclusion that the third confession was voluntary. Although we do not agree with the state court judge that German's testimony that the desk sergeant denied that Alexander was at the 73rd Precinct stationhouse would have been hearsay,[7] the

---

6. *See* note 5 *supra.*

7. Alexander correctly points out that German's proposed testimony concerning the desk sergeant's statement that Alexander was not at the stationhouse would not have been hearsay, for the sergeant's denial would not have been offered to prove the truth of the matter asserted in the statement (*i. e.*, that Alexander was,

in fact, not at the stationhouse). The statement would instead have been offered merely to show that the sergeant did, in fact, make the statement. When viewed in conjunction with Alexander's conceded presence at the stationhouse on the day in question, the desk sergeant's statement could then be shown to be false. Once the falsity of that statement had

state judge, despite his belief that the evidence would be inadmissible, did alternatively determine that German's testimony would not, in any event, have affected the judge's conclusion that Alexander's statement to DiBenedetto was voluntary. In view of Justice Mollen's careful marshaling of the evidence on the issue of whether Alexander's third confession was voluntary, and in view of the deference which we are statutorily required to pay to the state court's findings of fact, we must conclude that there is no ground here for our disputing the state court judge's conclusion that German's testimony would not have affected the ultimate result the judge reached as to whether Alexander's third confession was voluntary.

Finally, we note that there is ample evidence in the record of the *Huntley* hearing to support Justice Mollen's ultimate finding of fact that Alexander's statement to the assistant district attorney was voluntary. To be sure, Alexander testified that he had been physically abused by the police officers while being held at the stationhouse, but Justice Mollen specifically found that Alexander, whom the judge diagnosed as being afflicted with "selective amnesia," was not a credible witness. And, of course, the state court judge, sitting as the assessor of the credibility of witnesses and as the finder of fact, was indeed entitled to discredit Alexander's testimony and that of any other witness and hence to find, as he did find, that Alexander had not been subjected to any physical abuse, either upon his arrest or at any time during his detention at the 73rd Precinct stationhouse. Absent any physical violence there are still some potentially troubling aspects to a just resolution here. Nevertheless, what the record as a whole seems to disclose is that while Alexander was not enjoying the accommodations or amenities that a visiting foreign dignitary might expect as a public guest, his ordeal at the stationhouse was apparently not so severe that he could not give voluntarily a comprehensive and coherent confession to Assistant District Attorney DiBenedetto after 12 or 13 hours in custody. We must also keep in mind that our role here, as an appellate court, is more limited than that of the federal district court which, in turn, must play a more limited role in this collateral proceeding than it would if it were hearing the evidence and finding the facts on a truly *de novo* basis. We therefore hold, as did Judge Curtin, that under the circumstances here the state court's determination that Alexander's third confession was voluntary is entitled to the usual presumption of correctness and, in view of the lack of any convincing countervailing evidence, *Tanner v. Vincent, supra,* 541 F.2d at 937, we agree that that determination was correct.

We turn now to Alexander's contention that his third confession should have been suppressed because it was extracted from him in violation of his sixth amendment right to counsel. Relying upon *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), Alexander claims that his "being held incommunicado violated his sixth amendment right to counsel." He further contends, placing substantial reliance on the recent case of *Brewer v. Williams,* 430 U.S. 387, 397–98, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), that under the circumstances surrounding his detention on September 8 the state cannot demonstrate that Alexander voluntarily waived his right to counsel. In his decision below, however, Judge Curtin found, as did the Appellate Division of the Supreme Court of the State of New York, *see People v. Alexander,* 45

been so demonstrated, that falsity could thereafter be used circumstantially to suggest the existence of a conspiracy to sequester Alexander until he had confessed.

By way of illustrating why the sergeant's statement would not be hearsay, Professor Wigmore provides an enlightening example:

For example, in a prosecution against a defaulting embezzler Doe, it is desired to show that, after leaving his employment, he concealed himself and passed under a false name; here his statement, "My name is Roe," is not offered to evidence that his name was in truth Roe; on the contrary, it will be shown that his name was Doe; and the statement is not used as hearsay.

6 Wigmore, Evidence § 1766, at 250 (Chadbourn rev. 1976).

App.Div.2d 1023, 358 N.Y.S.2d 68 (2d Dep't 1974), on Alexander's direct appeal from his conviction in state court, that Alexander had not been deprived of his sixth amendment right to counsel. On the basis of the findings made by the state trial court judge and also on the basis of the record of the suppression hearing in the state trial court, it would be difficult to reach any other conclusion.

Justice Mollen made several specific findings of fact which we find are pertinent to our consideration of Alexander's claimed sixth amendment violation and which are entitled ·to the usual presumption of correctness. In particular, the state trial judge found that before each of his confessions on the 8th of September, Alexander had been carefully and fully apprised that he had a right to talk to a lawyer, to have a lawyer present during the police interrogation and to have a lawyer appointed to represent him if he could not afford a lawyer. Moreover, while at the stationhouse, Alexander was advised that he had a right to make a phone call. It is, moreover, evident from the record that Alexander understood that he had a right to consult with an attorney and that he voluntarily relinquished that right. For instance, when arrested and taken to the stationhouse, Alexander was not in an atmosphere completely foreign to him, for by his own admission he had been arrested on a number of previous occasions. At the suppression hearing in state court Alexander admitted, furthermore, that on the day he was apprehended he understood his rights. Yet, despite his knowledge of the constitutional rights he possessed, Alexander, whom the state trial judge found had not been subjected to any coercion at any time while he was at the stationhouse, never requested consultation with an attorney. Instead, on three occasions he voluntarily made incriminating remarks and, in view of his extremely detailed and precise responses during the third confession, it seems clear that, as Justice Mollen specifically found, Alexander "had no problem whatsoever in knowing what he was saying; he spoke with clarity which would indicate that there was no merit to defense contentions made during the course of the hearing that the defendant, either because of his drug habit or for any other reason, was unable to understand the proceedings."

Alexander's reliance on *Escobedo* to support his theory that his sixth amendment rights were violated inasmuch as he was held "incommunicado" and prevented from seeing his attorney is clearly misplaced, for the facts in *Escobedo* are a far cry from the facts present here which we have already outlined. Specifically, Escobedo had already retained an attorney prior to his interrogation at the stationhouse. The police, however, refused to permit Escobedo to speak to his previously retained attorney despite the fact that the lawyer was at the stationhouse and was requesting to speak to his client and notwithstanding the defendant's request, repeated at numerous times during the course of his interrogation, to speak to his attorney. Moreover, while Escobedo was repeatedly requesting to see his attorney, Escobedo's interrogators audaciously told him that his attorney "didn't want to see him." 378 U.S. at 481, 84 S.Ct. 1758. Finally, the police did not advise Escobedo of his constitutional right to consult with counsel prior to making any statements and to have counsel present while he was being interrogated. Here, although, concededly, there was an unfortunate mix-up at the 73rd Precinct stationhouse when Alexander's father-in-law was told by the desk sergeant that Alexander was not there, Alexander's wife *had* been told where he was being taken. And in contrast to the facts in *Escobedo* at no time from Alexander's arrival at the stationhouse until his confession to DiBenedetto later that evening did any attorney appear at the stationhouse or call the stationhouse requesting to speak to Alexander; Alexander, while in detention, was repeatedly and carefully warned of his constitutional right to counsel and, most significantly, at no time before or during his various discussions with the police officers or the prosecutor at the stationhouse did he, despite his undeniable familiarity with his right to counsel,

protest that he wished to consult with an attorney. To be sure, as have the courts who have previously dealt with this case, we surely do not commend or condone all the actions of the state prosecutor or of the local police, such as the arresting officers' failure to inform the desk sergeant at the 73rd Precinct that Alexander was being held there. Yet, our dissatisfaction with some of these specific, yet isolated, objectionable acts of the police or the prosecutor does not inevitably lead us to conclude, and we do not conclude, that Alexander was being held "incommunicado."

The facts here belie any claim by Alexander that he did not waive his right to counsel. We do not agree that the circumstances surrounding Alexander's detention and interrogations are similar enough to those in *Brewer v. Williams* for that recent Supreme Court decision to be of any assistance to Alexander here. There, the Supreme Court refused to find that, in the context of an egregious police interference with an existing attorney-client relationship, a waiver of the right to counsel had occurred. Again, a comparison of the circumstances there with those here is instructive and shows that in no way are the two situations comparable. There, where judicial proceedings against the defendant had already commenced, the defendant, who was a recent escapee from a mental institution, had even prior to his arrest been consulting regularly with counsel; in fact, it was the attorney who had advised the defendant to surrender in the first place. Moreover, the police not only knew that the defendant was represented by counsel (indeed, two attorneys were advising him) but the police had actually agreed with the defendant's principal attorney that they would not question the defendant unless counsel were present. Despite this express agreement, and notwithstanding the defendant's express and implied assertions of his right to counsel during the time he was alone with the police, one of the police officers admitted that the police deliberately began to manipulate the defendant so that he would make as many incriminating remarks as possible before speaking to his attorney. The facts surrounding Alexander's detention at the 73rd Precinct stationhouse do not, to put it simply, even begin to approach the affirmative and inexcusable police disregard of an existing attorney-client relationship that was so evident in *Brewer*. With full knowledge of his right to consult with an attorney, Alexander of his own free will chose, for whatever reason, to abstain from any exercise of that right and he must now accept the consequences of that entirely volitional decision.

We thus conclude that the record here, and the detailed and specific findings of fact which the state trial court judge made on the basis of that record, establish to our satisfaction as they also established to the satisfaction of the federal district judge below that Alexander's motion to suppress his confession to Assistant District Attorney DiBenedetto was properly denied. The confession was uncoerced and so was Alexander's decision to make that confession without benefit of prior or contemporaneous consultation with counsel.

Affirmed.

### APPENDIX

*By Mr. DiBenedetto*:

[Alexander] A. (answer continued) Pop your questions.

Q. Sam, on August 24, 1971, a few weeks ago were you at a Bohack Supermarket somewhere in Brooklyn? A. August 24th,—I don't know if that's the correct date or not. I do know I was in Bohack Supermarket. I don't know if it was the 24th, 25th, or 23rd.

Q. Where was this Bohack Supermarket located? A. Brooklyn, Flatbush section.

Q. Tell me who you were with and how you got there? A. There was three other fellows besides myself.

Q. Who were you with? A. Pete.

Q. Do you know Pete's name? A. I know him as Pete.

Q. Is that Edward Williams? A. The guy out there?

Q. Yes. A. That's his name.

Mr. DiBenedetto: Let the record indicate that Pete is otherwise known as Edward Williams.

By Mr. DiBenedetto:

Q. Who else? A. Bob.

Q. Bob Smith, Robert Smith? A. Yes, Robert Smith and Gene.

Q. Do you know Gene's last name? A. I was told here his last name was Twitty. The Detective told me his last name when I was here.

Q. Do you know where Gene hangs out or lives? A. I know they hang out on Atlantic and Saratoga.

Q. How did you meet these guys that day? A. He approached me.

Q. Who approached you? A. Gene approached me. He asked, "If I was game to make some money?" I asked him, "What type of money, and what type of game?" I asked what you have to do to "Make this quick money?" He said, "He had a place in mind," and he told me, "What I had to do, if I go along with him."

Q. What did you have to do? A. He wanted me to stand up to the door, and don't let nobody out of the store. Anybody who comes in to let them in, but not to let nobody out.

Q. What did you do? A. We went in the supermarket, and he told me—he said "You stand by the door."

Q. You went to Bohack Supermarket. How did you get there? A. We drove there.

Q. Whose car? A. Pete's car.

Q. What kind of car was it? A. It was a dark burgundy, or maroon—black top.

Q. Do you know what make it was? A. A Dodge. I don't know the model.

Q. And whose car was that? A. Pete's.

Q. That's Edward Williams? A. Yes.

Q. And what happened when you guys got there? A. Gene, myself, and Bobby—the three of us went in the Supermarket.

Q. Where did you park? A. I don't know the name of the street, but we parked around the corner from the Supermarket.

Q. And what happened when you got out of the car? A. Gene told Bobby—he said, "When I tell you to—open the register," and he said, "Sam, you go to the door," and he said, "I'll lock the manager up—assistant manager." He said that he would lock him up. He said, "When we finish, everybody is going to leave—to go out of the place and leave."

Q. Did you have a gun at the time? A. Yes, I had a pistol.

Q. Where did you get the gun from? A. Gene gave it to me.

Q. Where did Gene get the gun from? A. I don't know.

Q. Did any of you go to the trunk of the car? A. Oh, yes. He got them out of the car. I thought you meant where he got them before that. He got them out of the car.

Q. Out of the trunk, or where? A. I think it was in the trunk.

Q. Do you know who opened up the trunk? A. No, I don't remember.

Q. How many guns were there? A. Two guns.

Q. Do you know what kind or what caliber? A. I had a—I think it was a twenty-two, and the other one was a twenty-two—frame.

Q. Was it a revolver or an automatic? A. It was like a Derringer, pretty small—you know. Actually I didn't see Gene's gun. He said, "He had a twenty-two also."

Q. Was his a revolver or an automatic? A. I guess you can call it a revolver.

Q. You had a gun? A. Yes—we entered the Supermarket.

Q. And? A. He told me when I got in the Supermarket—he said, "He told me like I was shopping—get a cart like I was shopping." I got a cart, and I walked around the store a couple of times.

Q. Yes? A. And he called me in the store. He had two or three guys with him.

Q. Who was this? A. Gene—he had two or three guys with him.

Q. Who were these two or three guys with him? A. These were employees of the store.

Q. Did he have a gun out at the time? A. Yes, he had a gun out. He said, "Go to the door."

Q. Yes? A. I went to the door, and this kid Bobby—I don't know what he said. He said something to Bobby. What exactly, I don't know. Bobby went over to the register, and someone asked one of the fellows—standing near the counter. I think he worked in there also, and Bobby said, "We're holding the place up." And one of the guys said, "Gene"—about four, about three or four people went over to the safe.

Q. Do you know where this safe was? A. It was in front of the store.

Q. From where you were standing, at the store door, could you see the safe? A. The safe was to my right—I don't know, about—I can't estimate here, because it's too short—from the door where I was standing.

Q. How far away was it approximately? A. About twenty-five to thirty feet, I guess.

Q. Were you by the door? What was Gene doing at the safe? A. Gene—one of the guys was trying to open the safe. He was hollering.

Q. What was Gene hollering? A. He said, "Open the safe, you know—After the kid emptied the register, I went over and said to Gene, "Let's go."

Q. And what happened then? A. Gene swung at the guy with the gun. I don't know if he hit him or not, and the gun went off. I'm pretty sure he hit the man up on the side of the head. I'm not sure, like he boxed him, and the gun went off. I turned around, and I walked out. I was the first one out of the store, and Bobby came out. But, before I got out of the store, I had heard another shot.

Q. Did you turn around? A. No, I didn't turn around. Gene was right behind me. Bobby was out of the door. He was right behind me. He said, "Let's run, let's run. Let's take a trot."

Q. Who said that? A. Gene. When we were driving we were telling people directions where to go—he didn't ever tell me the damn man was shot or nothing.

Q. You said that Gene struck the guy with the gun? A. He—I seen him with the gun. I don't know whether he hit him across the head or what. I know he swung at the guy.

Q. When you heard that shot did you see what happened? A. Yes, I was standing there—when he hit the gun. Nothing happened then. I saw the guy holding his head. He held his head.

Q. About how far apart in time was the first shot from the second shot; was it five seconds, ten seconds, a half a minute, or a minute? A. I don't know—about a half minute or a minute, I guess. It was not that long—from the first shot. I got to the door. Then I heard the second shot.

Q. When did you first learn that this guy had been hurt? A. When the officer told me this morning—he told me and my wife that they had me for robbery and homicide. Gene didn't tell me the man was shot or nothing.

Q. When you got in your car, did you have a conversation with Gene and the other guys? A. He didn't say the man was shot—I asked him—"You didn't shoot him?"

Q. What did Gene say? A. Gene said, "Yes, I did." I said, "I know you didn't shoot the man; I was standing right over the man when the gun went off." And the second shot—I didn't know whether he shot to scare the people in the store. I think that was the second shot. I didn't see that second shot which was the fatal shot.

Q. What did you do with the gun at that time? A. I gave it back to Gene.

Q. Do you know what Gene did with the guns? A. No.

Q. Did you get any money out of the deal? A. I got some money.

Q. How much did you get? A. A Hundred and something Dollars—pretty close to Two Hundred Dollars.

Q. Sam, do you have anything to add, or is there anything else that you want to tell me? A. I can say this: "If I know Gene had shot that man that day—I don't know how the rest of the fellows feel—I guess they feel the same way, but that type of money, if he had explained to me what he was going to do—I don't know whether Gene would have killed me in the car that day, or—that hurt the shit out of me for that kind of money. It didn't even make no sense for him to die—we got the money out of the register—that's what he went for—you have to excuse the tears. When he told me that man died for that kind of money—that didn't make no sense. That hurt the hell out of me. I don't give a damn who it was—it could have been my brother, my friend or anybody. If you hurt a man for that kind of money it don't make no mother fuckin' sense. I don't know if Gene's crazy or what. It hurt me.

Q. Is there anything else you want to add in reference to this incident? A. No response.

Q. Or is that the whole story as you remember it? A. We went and split the money up. We shared the money up in my apartment. My wife—I thought my wife was at work. When I got home she was upstairs. I made some excuse up to her, and she said, "Okay". She said, "Hurry up and come out of there, because the kids want to look at the T.V." I said, "We're not going to be too long."

Q. How long did the incident at the Supermarket take from the time when you entered the store till you got out? A. I really can't say.

Q. Do you know what time of day this was? A. It was in the afternoon—like I said, when I got home, my wife don't usually get home till about five o'clock or ten after five. She works at Kings County. When I got home it was just getting to be five, or a little before five—like I said—it surprised me to know that she was there already.

Q. Anything further, Sam? A. Like I said, I know it was wrong to do the stickup, but I didn't have no intention—I didn't

have the slightest idea—from what it looked to me that something—that somebody was going to get hurt—somebody was going to get hurt. I don't think I would never do it. I could have stayed out on the street. I could have robbed a working man—I could have robbed a working man, and get the same type of money I got out of the supermarket, and nobody would be hurt—a man loses his life—because, I don't know if Gene is crazy or what. I can't say man; I can't analyze it. I'm no analyst or no psychiatrist. I can't say if the man is crazy. He got a lot of funny ways. What the Detective explained to me today you have got to be sick—you know what I'm saying—something got to be wrong with him up there.

Mr. DiBenedetto: Thank you.