**James GANDIA, Petitioner,**

v.

**Robert HOKE, Superintendent of Eastern Correctional Facility, Respondent.**

**No. 85 Civ. 4634.**

United States District Court, E.D. New York.

Dec. 2, 1986.

---

Mark Gombiner, Gombiner and Avenia, New York City, for petitioner.

Karen F. McGee, Chief, Appeals Bureau Office of District Attorney, Staten Island, N.Y., for respondent.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

### I. *Introduction*

Petitioner James Gandia was convicted of murder in the second degree and robbery in the first degree in a jury trial in the Supreme Court of the State of New York, County of Richmond. He was sentenced to an indeterminate term of twenty-three years to life in prison. The judgment of conviction was affirmed without opinion by the Appellate Division of the Supreme Court, Second Department. 87 A.D.2d 1007, 450 N.Y.S.2d 248. Leave to appeal to the New York Court of Appeals was denied. 56 N.Y.2d 810, 452 N.Y.S.2d 1031, 437 N.E.2d 1166. In his current petition for a writ of habeas corpus, 28 U.S.C. § 2254, Gandia seeks to have his conviction vacated and to be released from state custody unless the State of New York affords him an immediate retrial.

Gandia's habeas petition rests on the contention that he was deprived of his fifth amendment privilege against self-incrimination when authorities questioned him about the death of Pablo LaTorre, whose body was found on August 11, 1978. Specifically, Gandia argues that the interrogation violated *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that it was therefore error for the state court to deny

his motion to suppress a statement he signed early on the morning of September 5, 1978. The suppression motion was denied after a *"Huntley* hearing," *see People v. Huntley,* 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), upon a finding that Gandia waived his *Miranda* rights.

The State maintains that Gandia's petition should be dismissed because he failed to exhaust the remedies available in state court. *See* 28 U.S.C. § 2254(c). The State adds that, if this court reaches the merits, it should deny the petition on the ground that Gandia has presented no convincing reason to overturn the state court's finding that the September 5 statement was made voluntarily. *See id.* § 2254(d); *Alexander v. Smith,* 582 F.2d 212 (2d Cir.), *cert. denied,* 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978).

## II. *Exhaustion of State Remedies*

It has long been settled "that a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *accord, e.g., Harris v. Scully,* 779 F.2d 875, 878 (2d Cir.1985). Under *Picard,* the petitioner must "provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim," *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam) (quoting *Picard,* 404 U.S. at 276–77, 92 S.Ct. at 512–13); "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made," *id.* (citations omitted).

The leading exhaustion case in this circuit is *Daye v. Attorney General of the State of New York,* 696 F.2d 186 (2d Cir. 1982) (en banc), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). *Daye* held that the petitioner "must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Id.* at 191.

Specifically, he must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim.

Likewise, the petitioner must have placed before the state court essentially the same legal doctrine he asserts in his federal petition. The chief purposes of the exhaustion doctrine would be frustrated if the federal haveas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court.

*Id.* at 191–92 (citations and footnote omitted); *accord Matusiak v. Kelly,* 786 F.2d 536, 542 (2d Cir.) (petitioner must present both essential facts of his claim and legal basis for the claim to state court), *cert. dismissed,* —— U.S. ——, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986).

*Daye* enumerated four "ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution." 696 F.2d at 194. They are:

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.; accord Jackson v. Scully,* 781 F.2d 291, 294–95 (2d Cir.1986); *Petrucelli v. Coombe,* 735 F.2d 684, 688 (2d Cir.1984).

■ In support of his contention that his *Miranda* rights were violated, Gandia cited to the appellate division the case of *Stumes v. Solem,* 511 F.Supp. 1312 (D.S.D.1981), *rev'd,* 671 F.2d 1150 (8th Cir.1982), *rev'd,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), *decision on remand,* 752 F.2d 317 (8th Cir.), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985). The appellate brief cited only the district court

opinion in *Stumes;* that case's subsequent history had yet to be played out when the brief was filed in October 1981. The discussion of *Stumes,* however, in a point of the brief entitled "The Statements Taken from Defendant were not Voluntary," could not have left the state court in much doubt as to what Gandia was arguing. In particular, the district court's opinion in *Stumes* discussed and quoted at length from *Michigan v. Mosley, supra. See Stumes,* 511 F.Supp. at 1323–24. At a minimum, Gandia's reliance on *Stumes* constituted "reliance on pertinent federal cases employing constitutional analysis," *Daye, supra,* 696 F.2d at 194. It is insignificant that Gandia cites different cases now than he did in state court, because the legal basis of his claim remains the same. *See Harris, supra,* 779 F.2d at 878. Nor is there any doubt that the factual premises posited here were relied upon in state court as well.

Moreover, in *Daye,* the court of appeals observed:

A number of legal theories may be advanced as to why a confession was not voluntary. Yet all that is needed to alert the state courts to the constitutional nature of the claim is the exposition of the material facts and the assertion that the confession was not voluntary.

696 F.2d at 192 n. 4. Gandia easily satisfies this lenient standard. Nor is this a case in which the relevant citation to *Stumes* was hidden among numerous other citations. *See Petrucelli, supra,* 735 F.2d at 689. Finally, there is no requirement that Gandia seek state collateral relief in order to satisfy the exhaustion requirement. *Irving v. Reid,* 624 F.Supp. 787, 789 (S.D.N.Y.1985) (citing *Daye, supra,* 696 F.2d at 190–91 n. 3). For the foregoing reasons, the court concludes that Gandia has exhausted his state remedies. Accordingly, the court turns to the merits.

### III. *Factual Background*

Gandia was arrested by Detective William Nestel at approximately 9:00 p.m. on September 4, 1978. Nestel told Gandia that he was under arrest for grand larceny of an automobile and advised him of his *Miranda* rights. Nestel and his partner, Detective Santorro, drove Gandia to the station house, where he was taken to the interrogation room. After Nestel advised Gandia of his rights once again, he "told him that we have numerous witnesses that will put him riding and driving this particular '78 Ford Granada which belonged to the deceased, Pablo Latorre." Record of *Huntley* hearing at 46 (testimony of Detective William Nestel). Cross-examination by Gandia's attorney continued as follows:

Q   You said "the deceased." Is that the word you used at that time?

A   Yes.

Q   And you told him when you arrested him that you arrested him in connection with Grand Larceny/Auto; is that correct?

A   That is correct.

Q   Did he ask you what you meant by the word "deceased" concerning that automobile at that time?

A   No, he didn't.

Q   That was your word?

A   Yes.

Q   And what else did you inform him of at that time to initiate this conversation?

A   I asked if there was anything he wanted to tell me about that auto. "I can put you in it."

Q   What did he say at that time?

A   He then said, "I'll tell you about the auto. I have nothing to do with anything else."

*Id.* at 47.

Nestel then questioned Gandia about the automobile. At approximately 11:00 p.m., Gandia signed a statement that embodied his earlier remarks to the effect that he had gone for a ride in a car with one Raymond Fischetti. Thereafter, Nestel left the interrogation room for about ten minutes and returned with a cup of coffee for Gandia. Santorro, who was present throughout the interrogation, remained in the room. After several more trips in and out of the room, Nestel initiated a new conversation with Gandia at approximately

12:15 a.m. on September 5. He told Gandia that he had spoken with Wayne McBayne—an accomplice of Gandia who was to testify against him at trial—and that McBayne "gave a statement relative to this whole thing, about the car and about the homocide [*sic*], and he says you both were involved, and he makes you the bad guy." *Id.* at 72. In reality, McBayne had not accused Gandia of LaTorre's murder. Detective Nestel went on to tell Gandia: " 'If you want to tell me about it, tell me your side of it because I don't think you are the bad guy. I'd be willing to listen to you.' " *Id.* Gandia replied: " 'I'll tell you the whole truth.' " *Id.* at 77. As with his first statement, Gandia first spoke to Nestel, who prepared a written version of his remarks, which Gandia ultimately signed. Gandia denied killing LaTorre, but admitted to having observed an armed robbery. He said that he had seen McBayne hit LaTorre over the head with a lug wrench and stab him to death.[1]

Following the *Huntley* hearing, Justice DiVernieri of the Supreme Court, Richmond County, ruled that neither of Gandia's statements should be suppressed. He found that Gandia was properly given his *Miranda* rights and waived them. Justice DiVernieri determined that there was no proof of intensive or suggestive interrogation by the detectives, and that Gandia's admissions were voluntary beyond a reasonable doubt.

Gandia contends that his statement during the first series of questions—"I'll tell you about the auto. I have nothing to do with anything else"—constituted an invocation of his right to silence on all topics other than the car theft. Accordingly, Gandia maintains that the failure to administer fresh *Miranda* warnings before the second round of questioning violated his fifth amendment rights, particularly in view of the short interval between the two rounds of questioning and the false report that McBayne had accused him of murder. Gandia argues that the refusal to suppress his second statement was a constitutional error that requires issuance of a writ of habeas corpus.

### IV. *Standard of Review*

The habeas corpus statute, 28 U.S.C. § 2254(d), provides that findings of fact by a state court should be presumed correct unless one of eight exceptions applies. The state now relies on, *inter alia, Alexander v. Smith,* 582 F.2d 212, 217–18 (2d Cir.), *cert. denied,* 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978), for the proposition that this court should defer to the state court's finding of voluntariness. But *Alexander*

---

**1.** These are among the relevant portions of Gandia's second written statement:

> [W]e saw a 1978 Granada, gray two door. A male hispanic, 50 years, five six, gray and black hair, brown shirt, green pants. He was cleaning his car. Wayne said, I'm going to go over and see if I can get some money from him. I said I'll wait here.
>
> Wayne walked over and talked to him, and came back and said, that fucking guy got wise. Quote, I'm going to kill him. Unquote. The guy had gotten into the car and drove down by the building. We were not walking up the bridge. As we got to the stairs, the car had stopped and the guy had gotten out. Wayne said, There goes that mother-fucker. I'm going to get him.
>
> Wayne went down. They started talking, then both walked up the tracks. I stayed on the top of the bridge and watched them. They started to argue and I saw the guy raise his right hand. Then Wayne hit him in the head with a black object that was solid but had a movable end. After Wayne hit him, he

> fell backwards and he grabbed his head with both hands. I then yelled to Wayne, I said, Leave him alone or you will kill him. Wayne then went crazy and started to stab him. He just kept sticking him.
>
> \* \* \* \* \* \*
>
> Wayne said, I killed the guy because he pulled a knife on me. I told him, you should have left him alone, he wasn't bothering anyone.
>
> Wayne had blood on his hands. He offered me money but I didn't take any. Wayne said if he got caught, he wouldn't tell anyone that I was there.
>
> \* \* \* \* \* \*
>
> I did not know the guy had come from the hospital until I read it in the papers. I did not talk with this guy. When he raised his right arm, I did not see how high. I just saw him raise it. It did not look like he was throwing a punch.
>
> After Wayne was through talking with the guy and they walked up the tracks, the guy was carrying a paper bag. I didn't stab anyone, I don't care what Wayne said.

no longer states the law, in view of the Supreme Court's holding "that the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination," *Miller v. Fenton*, —— U.S. ——, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985). The Court determined that the voluntariness of a confession is "beyond the reach of § 2254(d)," *id.* 106 S.Ct. at 453, because that "dispositive question ... has always had a uniquely legal dimension," *id.*

This is not to say that *Miller* requires *de novo* review of state court findings. The Court recognized that

> subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in § 2254(d) are inapplicable.

*Id.*

■■■ Thus, notwithstanding *Miller*'s holding that voluntariness is a legal question, section "2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). On the other hand, "[t]he attachment of the presumption of correctness to a particular finding of fact does not deprive the federal district court of the *discretion* to hold an evidentiary hearing." *Knaubert v. Goldsmith*, 791 F.2d 722, 727 n. 3 (9th Cir.1986) (per curiam) (emphasis in original). *See generally Evans v. McCotter*, 790 F.2d 1232, 1235 n. 1 (5th Cir.1986) (voluntariness is question of law subject to independent federal determination, but subsidiary factual question of whether police engaged in intimidation tactics is entitled to presumption of correctness); *Woods v. Armontrout*, 787 F.2d 310, 313 (8th Cir.1986) (if state evidentiary hearing is procedurally

fair, federal court may accord substantial deference to state court determination of facts surrounding voluntariness of confession); *Bryant v. Vose*, 785 F.2d 364, 368 (1st Cir.) (facts as found by state trial judge do not support claim that confession was coerced), *cert. denied*, —— U.S. ——, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986).

■■■ Here, there is not much dispute about what happened while Gandia was in the presence of Detectives Nestel and Santorro. The parties differ only on the legal ramifications of the fact pattern outlined above. In these circumstances, the state court's finding that Gandia's admission was voluntary does not dispose of the matter. If the rule were otherwise, a state court could find that policemen beat and drugged a suspect but that his confession was nevertheless voluntary, and that conclusion would bind the habeas court. Under *Miller*, this court is obligated to reach a conclusion of federal law on the subsidiary facts as found by the state court.

### V. *The Merits*

The court's conclusion of federal law turns on three questions presented by the papers. First, did Gandia ever invoke his right to remain silent? Second, if he did, was *Michigan v. Mosley* violated when Gandia was questioned about the murder? Third, was Gandia's statement rendered involuntary when Detective Nestel falsely stated that McBayne had implicated Gandia?

### A. *Invocation of Right to Remain Silent*

*Miranda* taught that when an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona, supra*, 384 U.S. at 473–74, 86 S.Ct. at 1627 (footnote omitted). The question presented by that holding is "under what circumstances, if any, a resumption of questioning is permissible." *Michigan v. Mosley, supra*, 423 U.S. at 101, 96 S.Ct. at 325 (footnote omitted). *Mosley* answered the question as follows:

A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored...." 384 U.S. at 479 [86 S.Ct. at 1630]. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." *Id.* at 474 [86 S.Ct. at 1628]. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

*Id.* at 103–04, 96 S.Ct. at 326 (footnote omitted).

Before the court may determine, however, whether the police violated *Mosley* in questioning Gandia about the homicide, it must first decide whether Gandia ever invoked his right to remain silent. If, instead, he waived his *Miranda* rights, *Mosley* analysis never comes into play.

■ "[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Here, Detective Nestel told Gandia that he could "put" him "in" the automobile in question and asked Gandia if there was anything he wanted to say about it. Gandia replied: "I'll tell you about the auto. I have nothing to do with anything else." Because Gandia had been given his *Miranda* rights, and understood them, his agreement to talk about the automobile clearly constituted a waiver. The question is whether Gandia's second sentence—"I have nothing to do

with anything else."—invokes the right to remain silent with respect to anything other than the automobile. This court finds that it does not.

In *Taylor v. Riddle*, 563 F.2d 133 (4th Cir.1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978), the habeas petitioner, when confronted with a sheriff's question about going to bed after seeing blood on the decedent, answered, "[y]ou've done asked me a question I can't answer," *id.* at 135. The court of appeals upheld the state trial court and the federal district court in their finding that the statement was not an invocation of the right to silence but an expression of inability to answer. *Id.* at 137. In particular, the Fourth Circuit emphasized the trial court's ability to discern the petitioner's meaning, given its observation of the witnesses. *Id. Cf. Damiano v. Gaughan*, 592 F.Supp. 1222, 1226 (D.Mass.1984) (petitioner's steadfast insistence in non-custodial setting, that he had no information to give police authorities cannot be construed as invocation of fifth amendment privilege), *aff'd*, 770 F.2d 1 (1st Cir.1985).

Unlike the petitioner in *Taylor*, Gandia did not protest his *ignorance*. He did more; he protested his *innocence*. The statement, "I have nothing to do with anything else" may be construed, quite reasonably, as an assertion that his culpability went no further than the automobile. Thus, the state court had ample justification to find that Gandia's statements were voluntary, and that he began by discussing the automobile and eventually, while still understanding and waiving his *Miranda* rights, agreed to discuss the homicide. Even under *Miller v. Fenton*, this court must accept the state court's subsidiary factfinding, if fairly supported by the record. The factfinding leading to the conclusion that Gandia's confession was voluntary is fairly supported by the record, and this court accordingly finds, as a matter of federal law, that Gandia never invoked his right to remain silent.

### B. *Michigan v. Mosley*

Because the court finds that the right to silence was never invoked, it is unnecessary to consider the implications of *Michigan v. Mosley* for this petition. As explained above, *Mosley* deals with resumption of questioning after the right to remain silent is invoked. If the right is never invoked, *Mosley* has no relevance.

### C. *Voluntariness in Light of Trickery and other Miranda Violations*

Finally, Gandia argues that police violations of *Mosley* were exacerbated by other *Miranda* violations. Although the court has found that *Mosley* is irrelevant, other *Miranda* violations, if demonstrated, could entitle Gandia to issuance of the writ. But Gandia has not demonstrated other *Miranda* violations.

■ Thus, it is true that Detective Nestel misled Gandia when he purported to relay statements by McBayne that implicated the petitioner. Under the "totality of the circumstances" test, however, misrepresentations of an accomplice's statements are relevant, but insufficient to make an "otherwise voluntary confession inadmissible." *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969); *accord Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 1297–98, 84 L.Ed.2d 222 (1985); *see generally United States v. Seinfeld*, 632 F.Supp. 622, 625 (E.D.N.Y.1986) (misrepresentation of policeman's identity does not render admission involuntary).

■ Gandia's next argument is that *Miranda* was violated because he was not told that he had the right to terminate questioning at any time. But *Miranda* requires only "that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation." *Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). While *Miranda* requires the police to cease questioning at the request of the detainee, 384 U.S. at 473–74, 86 S.Ct. at 1627, this is not one of the rights that has to be enumerated in the *Miranda* warnings. Failure to advise a suspect of his right to terminate questioning is "an important factor to be considered in determining the voluntariness of any statements made," *United States v. DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978), but this warning is not expressly required, *id.* Under the totality of the circumstances, the state court was permitted to find that Gandia's statement was voluntary, even in the absence of advice that he could terminate questioning at any time.

■ Finally, Gandia contends that the short period between the two rounds of questioning violated *Miranda* because *Mosley* requires suspension of questioning for a significant time before interrogation is resumed. Leaving aside whether a significant time lapse is an absolute requirement of *Mosley*, the short time lapse here is irrelevant because of *Mosley's* inapplicability to these facts. Inasmuch as Gandia never invoked his right to remain silent, there was nothing coercive in continuing to question him after a short break; there was no "cooling off" period required because Gandia never asked his interrogator to "cool off." Nor were fresh *Miranda* warnings required after a short hiatus. *See, e.g., United States ex rel. Patton v. Thieret*, 791 F.2d 543, 547–48 (7th Cir. 1986); *Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir.), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985).

## VI. *Conclusion*

For the foregoing reasons, Gandia's petition for a writ of habeas corpus is hereby dismissed.

SO ORDERED.