**Norman STUMES, Petitioner,**

v.

**Herman SOLEM, Respondent.**

**No. CIV77–4049.**

United States District Court,
D. South Dakota, S. D.

April 10, 1981.

Edward J. Leahy, of May, Johnson, Doyle & Becker, Sioux Falls, S. D., for petitioner.

Judith A. Atkinson and LeAnn Larson Finke, Asst. Attys. Gen., Pierre, S. D., for respondent.

## MEMORANDUM DECISION

NICHOL, Senior District Judge.

Petitioner, Norman Stumes, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner alleges that his confine-

ment under the custody of Herman Solem, Warden of the South Dakota State Penitentiary, is based on a conviction in state court for first degree manslaughter that was the result of proceedings that deprived him of his fifth, sixth, and fourteenth amendment rights. Specifically, the petitioner alleges that the state proceedings were constitutionally invalid for the following reasons:

## I.

Petitioner was denied his constitutional right to counsel.

## II.

The admission into evidence of strands of hair from the victim, the petitioner, and unidentified hair found on the victim, without sufficient foundation, deprived petitioner of due process of law.

## III.

Petitioner's right to due process of law was violated when the trial court submitted to the jury the question of guilt as to first degree manslaughter over the petitioner's objection.

## FACTS AND PROCEDURAL HISTORY

On September 17, 1973, the body of Joyce Hoff was discovered in her apartment at Sioux Falls, South Dakota. She was the apparent victim of a homicide. The policeman investigating the crime described the body as follows:

> I observed a woman that was mostly nude. She had on a light greenish . . . turquoise . . . pair of . . . baby doll pajamas. The bottoms had been ripped mostly off and (were) lying . . . on her left side. The upper part of this night ensemble had been torn and ripped and was lying . . . upon her . . . left shoulder.

The Minnehaha County Coroner performed an autopsy. His external examination revealed that the deceased had a bruised and swollen eye, a round bruise on her cheek, and small scratches and bruises on the bridge of her nose and on her lips. There were also small hemorrhages in the eyes and a discoloration of the neck and face. Further examination revealed that a plastic spray can top had been forced into the victim's vagina.

The Coroner concluded that the cause of death was not natural, but due to a lack of oxygen—either anoxia or asphyxiation. There were, however, no visible marks of strangulation. The Coroner also concluded that the victim had engaged in sexual intercourse sometime between midnight and 2:00 A.M., prior to her death.

During the course of the investigation conducted by the Sioux Falls Police Department, petitioner became one of the suspects. At the time of the investigation petitioner had reckless driving, perjury, and felony check charges pending against him. He was represented on the reckless driving charge by Steve Jorgensen, a Sioux Falls lawyer who had previously represented the petitioner on other matters.

The fact that the petitioner was being sought by the police came to the attention of petitioner's mother, Jean Hamilton. In light of this fact and Mrs. Hamilton's feeling that petitioner had not been treated fairly in previous contacts with police, she contacted Steve Jorgensen relative to retaining him to represent petitioner. She paid Jorgensen $500.00 and he agreed to represent the petitioner. There were, however, no formal charges pending at this time against the petitioner with respect to the Hoff homicide.

Shortly after accepting the retainer, Jorgensen contacted Don Skadsen, Chief of Detectives, Sioux Falls Police Department, to inform them that he was aware that they were looking for petitioner. Jorgensen testified at the evidentiary hearing that the conversation was as follows:

> (t)hat in all probability, if Norman (petitioner) contacted anyone, he would probably contact me inasmuch as I had represented him in the past, and that I would make a sort of deal with them (police) that if Norman contacted me first, that I would persuade him to surrender himself for questioning, if they would agree that if they found him first, they would contact me and let me talk to him before they began questioning him.

Mr. Jorgensen further testified that the agreement that he had with the police was "with respect that they would contact me if they found him before I did." "They kept their part of the obligation as far as I was concerned," Jorgensen said; "there wasn't any agreement whatsoever, either express or implied, concerning the scope of questioning that was permissible on the trip from Green Bay to Sioux Falls."

On September 27, 1973, petitioner was arrested in Green Bay, Wisconsin, on the perjury and felony check charges. He was informed that he was under arrest for Sioux Falls authorities, searched, and given his *Miranda* rights. He was then placed in the Brown County, Wisconsin, jail.

Subsequent to petitioner's arrest and prior to the transporting of petitioner back to South Dakota, Jorgensen was contacted at home by Detective Skadsen to advise him that petitioner had been arrested in Green Bay. Jorgensen then attempted to contact the petitioner at the Brown County Jail. Because of the late hour and the fact that the person on duty was alone, petitioner could not be brought to the phone. Jorgensen was assured, however, that they would have petitioner call him in the morning. At 7:00 A.M. the next morning petitioner called Mr. Jorgensen. Jorgensen told petitioner "that he was wanted for questioning on a homicide..."

> I told him not to talk over the telephone about it, that he should not make any statements to anybody in law enforcement, that he had a right to remain silent, and that he should not make any statements until he had been returned to Sioux Falls and discussed the matter with me.

Later on that week and shortly before Skadsen and Sergeant James Green were to leave for Green Bay, Green and Jorgensen had a chance meeting outside the police department. Jorgensen informed Green that he had told the petitioner not to talk to the Sioux Falls police officers, but then added, "knowing you, you'll have a confession out of him before you get him back to Sioux Falls." Jorgensen, however, indicated during his testimony at the evidentiary hearing that the remark "certainly

wasn't in a serious vein and it wasn't intended to indicate to the detective that he had the okay to take a confession from my client." Green's testimony at the suppression hearing prior to petitioner's trial in state court was that Jorgensen had told him that "he'd talked to Norman on the telephone ... and had advised him not to talk to us but he stated that if he did talk to us there wasn't anything he could do about it."

On September 30, 1973, Skadsen and Green flew to Green Bay for the purpose of transporting petitioner back to Sioux Falls on the perjury and felony check charges as well as to question him about the death of Joyce Hoff. On the same date, Minnehaha County Deputy Sheriff Hendrick drove a sheriff's automobile to Green Bay to be used in returning petitioner to Sioux Falls.

On October 1, 1973, at approximately 9:30 A.M., Green, Skadsen, and Hendrick went to the Brown County Jail. After petitioner executed a consent form for the search of his car and residence he was transported to the Green Bay Police Department for questioning. Skadsen, Hendrick, and Lieutenant Milton Steeno of the Green Bay Police Department left to search petitioner's car and room. Green remained behind to question petitioner. At approximately 10:00 A.M. petitioner was advised of his rights. After his rights were read to him, petitioner stated that he understood his rights and that he had no objection to speaking to officers without the presence of counsel. During the next hour and one-half the subject of the Joyce Hoff homicide was discussed. At no time did petitioner make any statements implicating himself in the Hoff homicide. At approximately 11:45 A.M. Green advised petitioner that various people in Sioux Falls had taken polygraph examinations relative to the homicide. He then asked petitioner if he would be willing to do so. Petitioner stated, "that is a question I'd rather not answer until I talk to Steve." Questioning ceased at this point, but petitioner was told that the officers would again visit with him in the afternoon. Petitioner was then returned to the county jail at approximately 11:45 A.M.

At about 4:30 P.M. both detectives returned to talk to petitioner. No *Miranda* warning was given at this time. Petitioner was asked about certain evidence that the detectives had that placed petitioner in Joyce Hoff's apartment on the day of her death. Petitioner did admit being in decedent's apartment on September 17 and admitted having intercourse with her at that time. He denied, however, any involvement in her death. After approximately one-half hour of questioning Green asked petitioner if Joyce Hoff's death was intentional or accidental. Green and Skadsen both testified that petitioner responded by saying it was accidental. Petitioner then stated, "I would rather not talk about it any more at this time until I talk to my attorney, and after that I'll give you a full statement in regards to her death." The questioning immediately ceased.

The following morning Skadsen, Green, and Hendrick arrived at the county jail at approximately 9:00 A.M. to pick up petitioner and transport him back to Sioux Falls, a distance of over 600 miles.

Shortly after the trip began petitioner was informed of his *Miranda* rights and was asked if he understood them. He indicated he did. Petitioner was then asked if he was willing to talk to them. Petitioner, according to Skadsen and Green's testimony, shrugged his shoulders and nodded his head forward.

Petitioner was then questioned about the death of Joyce Hoff. According to Skadsen, "we discussed basically the same questions that were discussed the previous afternoon at the sheriff's office." This discussion lasted about 15 or 20 minutes and then the conversation switched to other matter such as the weather, car racing, petitioner's trip to Green Bay, and the Green Bay Packers.

This is confirmed by petitioner's testimony in which he classified the discussion in the car as follows:

Q: "Do you recall any interrogation that morning?"

A: "Not directly interrogation. There were some statements made."

During the trip back to Sioux Falls several stops were made including two or three stops for gas and refreshments and about 250 miles from Green Bay a stop for lunch. After lunch Skadsen and Green changed places.

After eating and resuming the trip petitioner classified the discussions that took place as follows:

Q: "Do you recall any interrogation after you had eaten?"

A: "No, I don't think there was any interrogation right after we ate. There was a general conversation."

Then, according to Skadsen and Green's testimony, approximately 90 miles from Sioux Falls, petitioner started crying and said, "taking a human life is so useless." This is confirmed by petitioner who described the scene this way: "Somewhere between Jackson and Worthington . . . I had a little conflict with my emotions and I made the statement that I couldn't understand why anybody would want to kill Joyce and that the taking of a human life is so useless." Petitioner was then asked and testified as follows:

Q: "Do you recall, was there any interrogation going on at that time. . . . ?"

A: "No, I don't believe so. There hadn't —I don't think there was any conversation in the car for maybe 10 or 15 minutes."

Green then told petitioner he would feel much better if he "got it off his chest." Petitioner then stated that he'd been wanting to tell somebody, but he just didn't know how to go about it. Then, according to Skadsen and Green's testimony, petitioner related how he had killed Joyce Hoff on September 17, 1973. According to the testimony of Green, petitioner stated that:

On the early morning of the 17th of September he'd been at the Mocamba Club, left there at approximately eleven-thirty in the evening, he'd gone home and dropped two tabs of acid, and decided that he wanted to talk to Joyce Hoff in regards to Sierri White. He stated he drove up to Joyce's apartment, parked his car in front of the victim's car—and this

was about one A.M. in the morning—and he stated that he went up and knocked on the door, and she asked who it was, and he identified himself. She asked what he wanted, and he stated he had to talk to her about Sierri White, and she let him in. He said he walked over and sat on the davenport, and she sat down with him, and he started to cry, and he said he couldn't stop. He said that this went on for about 15 minutes. He stated that Joyce got up and said, 'Norman, we'll talk about it when you feel better,' and she went into the bedroom. He stated that he sat there for about another five minutes, and was still crying, and he walked into the bedroom, and she got up and put her arm around him and tried to comfort him, and one thing led to another and he disrobed her and they had intercourse on the bed, and he said after that they got up and dressed, and she told him at that time that she was going to tell Sierri White what had happened. He said that he begged with her and pleaded with her not to tell her, and she wouldn't change her mind. He stated that at that time he was standing at an angle a little bit to her right, and he said he thought he struck her in the right cheek with his right fist, and she went down to the floor, and he stated that he strangled her with his hands. He stated that after that—I asked him at that time if he thought that Joyce Hoff was dead at the time he got up, and he stated, 'I believe she was. She wasn't breathing.' He stated that he covered her up with some blankets. He went down to his car, and got a screwdriver, came back upstairs and took the lock off of the door to make it look like a burglary. He stated that he took $6.00, the lock, and a towel from the house, and left. He stated that the next thing he remembered he woke up at home about two p. m. that afternoon.

Skadsen then asked petitioner how Joyce Hoff was dressed. Petitioner indicated that she had on a full length housecoat and light blue baby doll pajamas. Skadsen asked if the bottoms matched the top and petitioner said he believed they did. Skadsen then stated that there was a foreign object found in the vagina area and asked petitioner if he had placed it there. Petitioner indicated he didn't remember but he might have. Green then asked if petitioner would be willing to give the police a statement when they got back to Sioux Falls. Petitioner indicated that he would. It was at this point that the following exchange took place according to the testimony of Green and Skadsen:

Q: "Your attorney will undoubtedly advise you not to give one (statement)."

A: "I don't give a damn what he says. I'm doing anything I feel like, and I'll talk to anybody I want to."

According to Skadsen and Green's testimony that was the first time during the day that petitioner had mentioned his attorney.

The officers and petitioner arrived at the Minnehaha County Jail in Sioux Falls at approximately 6:45 P.M. Shortly after the petitioner had been placed in his cell he informed the jailer that he wanted to talk with Skadsen again. According to Skadsen's testimony petitioner was crying again and put his head on Skadsen's shoulder and said, "please tell them that I didn't mean to kill her, that it was an accident—that I'm not a vicious killer."

Petitioner was thereafter formally charged with the murder of Joyce Hoff. Counsel was appointed because of his indigency. A suppression hearing was held at which petitioner requested that the court suppress all of the admissions on the grounds that his constitutional rights had been violated. The motion was denied.

At trial, both Skadsen and Green testified relative to petitioner's admissions and petitioner was convicted by a jury of first degree manslaughter and sentenced to a term of life in the South Dakota State Penitentiary.

An appeal to the South Dakota Supreme Court was perfected on May 2, 1974. On May 6, 1976, the South Dakota Supreme Court remanded the conviction because of the absence of necessary findings of fact and conclusions of law in support of the order denying the motion to suppress. The

Supreme Court instructed the trial court that if the admissions admitted into evidence are found to have been involuntary from the "totality of the circumstances" . . . a new trial shall be granted, but if all such statements admitted . . . are found to be voluntary, the judgment shall be affirmed. In either event the trial court was given the authority to make the determination. The Supreme Court went on to say that, "the determination requiring the entry of findings of fact and conclusions of law we equate with a decision." *State v. Stumes*, 90 S.D. 382, 241 N.W.2d 587 (1976).

Accordingly, the trial court on October 18, 1976, entered findings of fact and conclusions of law specifically finding that, "(T)he State of South Dakota has met its burden of proof beyond a reasonable doubt by showing that the defendant knowingly, voluntarily, and intelligently waived his request for counsel and any other constitutional right which he possessed at the time when he gave incriminating statements to any law enforcement officers." The conviction was therefore automatically affirmed. Petitioner is currently serving his sentence under the custody of the State of South Dakota.

Petitioner's application for a writ of habeas corpus was filed with this Court on May 3, 1977. All claims raised by petitioner in this Court have been raised and decided on appeal by the South Dakota Supreme Court. *State v. Stumes, supra*. It is not required that petitioner seek further state post conviction review of those issues. *U. S. ex rel. Means v. Solem*, 480 F.Supp. 128 (D.S.D.1979), *aff'd* 646 F.2d 322 (8th Cir. 1980), *Eaton v. Wyrick*, 528 F.2d 477 (8th Cir. 1975), *United States ex rel. Russell Means v. Solem*, 457 F.Supp. 1256 (D.S.D. 1978), *Orricer v. State*, 85 S.D. 293, 181 N.W.2d 461 (1970).

This Court held evidentiary hearings on October 6, 1977, and May 19, 1978, to more fully develop the factual dispute surrounding petitioner's Fifth and Sixth Amendment claims. At the request of petitioner an additional hearing was held on December 19, 1980, for the purpose of supplementing the record by receiving into evidence police reports that had been in petitioner's possession but were not introduced at the prior evidentiary hearings. The State resisted the request to supplement the record.

■ The existence of newly discovered evidence would justify holding an evidentiary hearing. *Austin v. Swenson*, 522 F.2d 168 (8th Cir. 1975). The holding of a hearing, if not mandated, is within the sound discretion of the District Judge. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *Martin v. Beto*, 397 F.2d 741 (5th Cir. 1968), *cert. denied*, 394 U.S. 906, 89 S.Ct. 1008, 22 L.Ed.2d 216 (1969), 6A *Moore's Federal Practice*, 2d Ed. section 59.04(13), Advisory Committee Note, Rule 8, *Rules Governing Section 2254 Cases in United States District Courts*. Therefore, this Court grants petitioner's request to supplement the record and the police reports are received into evidence at this time.

In addition to the evidentiary hearings, this Court has examined the original and supplemental (post *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)) briefs that have been submitted. This Court has also received and studied the entire transcript, including the preliminary hearing, suppression hearing, and the trial itself.

Under 28 U.S.C. section 2254(d), a federal court has only limited power to reject a determination of a factual issue made by a state court after a hearing on the merits. *See also, Sumner v. Mata*, —— U.S. ——, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The statute provides that unless petitioner establishes, or the state admits, one of seven factors, the state determination of a factual issue shall be presumed to be correct. 28 U.S.C. section 2254(d). Alternatively, the state court's factual determination may be rejected if it is not fairly supported by the record. If none of these factors are established, the presumption of correctness applies and can only be overcome by "convincing evidence." *Sumner v. Mata, supra*.

As Justice Rehnquist declared in *Sumner v. Mata, supra*,

The very nature of habeas practice in recent decades makes the friction be-

tween the state and federal court systems inevitable. But that friction can be reduced, and section 2254(d) represents Congress' attempt to do just that. Congress meant to insure that state courts' factual findings would not be overturned by a federal court merely on the basis of the "preponderance of the evidence" standard.

This Court on October 6, 1977, entered an order granting petitioner's request for an evidentiary hearing. The order granted the hearing "for the purpose of taking evidence to develop material facts which were not adequately developed at the state court hearing ...." This order was based in part on petitioner's affidavit indicating that he wanted to call Steve Jorgensen, the lawyer that was retained by petitioner's mother after petitioner became a suspect in the Hoff homicide. It was this Court's belief that Mr. Jorgensen's testimony was necessary to adequately develop the facts essential to a determination of whether petitioner's constitutional rights were violated.

At the evidentiary hearing testimony from Mr. Jorgensen and Mr. Gene Paul Kean, Minnehaha County States Attorney at the time of the Hoff homicide, was presented. Neither of these persons testified at trial. Additionally, police reports not presented at trial were received into evidence by this Court.

 Therefore, it is the finding of this Court that petitioner has established, pursuant to 28 U.S.C. § 2254(d)(3), by convincing evidence, (the testimony of Mr. Jorgensen, Mr. Kean, and the police reports), that material facts were not adequately developed at the state court hearing and the presumption of correctness does not apply. *See Sumner v. Mata, supra.*

This Court, however, need not shut its eyes to the state's consideration of such issues. *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1952).

Accordingly, while this Court does not afford a presumption of correctness to the state court's factual determination, it does take cognizance of the fact that both the trial judge and the jury passed on the credibility of various witnesses. Therefore, this Court resolves the disputed facts as set out above.

## PETITIONER'S CONSTITUTIONAL RIGHT TO COUNSEL

The constitution of the United States guarantees individuals a right to the assistance of counsel through the provisions of the Fifth and Sixth Amendments. (U.S. Const., Amends. V & VI). The Sixth Amendment guarantees the right to legal representation at trial and at various pretrial stages of criminal prosecutions. *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *but see Scott v. Illinois*, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979). The Fifth Amendment, while not explicitly guaranteeing a right to counsel, has been interpreted to secure a right to legal assistance during custodial interrogation conducted before the filing of formal criminal charges. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The policies underlying these two constitutional protections are quite distinct. *See Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), *Edwards v. Arizona*, No. 79–5269, argument of counsel before United States Supreme Court, 49 L.W. 3399 (December 1980). Therefore, this Court examines separately petitioner's Fifth and Sixth Amendment claims.

## SIXTH AMENDMENT

The Sixth Amendment right to counsel safeguards the "fundamental rights of life and liberty". *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). At trial, the aid of counsel protects an accused against "convictions resulting from his own ignorance of his constitutional and legal rights." *Id.* at 465, 58 S.Ct. at 1023.

The Sixth Amendment also affords an accused the assistance of counsel before trial, during "critical stages" of the prosecution. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). A

stage is critical and implicates the Sixth Amendment right to counsel when the government confronts the accused in a manner such that the aid of counsel is necessary to preserve the accused's right to a fair trial, to the effective assistance of counsel at trial, and to meaningful cross examination of witnesses. *Id.* at 227, 87 S.Ct. at 1932.

The United States Supreme Court extended the Sixth Amendment "backwards" in *Hamilton v. Alabama*, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) and *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), to guarantee the right to counsel to an individual confronted by the government at adversary judicial proceedings before trial. *See also* Kamisar, *Brewer v. Williams, Massiah and Miranda: What is "Interrogation"? When Does it Matter?*, 67 Geo.L.J. 1 (1978).

A further extension "backwards" occurred in *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Under the Court's analysis in *Escobedo* the individual's Sixth Amendment right to counsel attached because the "focus" of the government's inquiry shifted from investigatory to accusatory and the government's purpose in questioning the suspect was to elicit incriminating statements. *See* Enker & Elsen, *Counsel for the Suspect: Massiah v. United States and Escobedo v. Illinois*, 49 Minn.L. Rev. 47 (1964). The *Escobedo* opinion left lower courts struggling with the notions of "focus" and "purpose" which were not defined "except by reference to each other and the *Escobedo* facts." *Id.* at 70.

Then in *Miranda v. Arizona*, decided on Fifth Amendment grounds, the Court explained that "police custodial questioning" was what *Escobedo* meant by "focus". 384 U.S. at 444, n. 4, 86 S.Ct. at 1612. Thus, although *Miranda* reaffirmed *Escobedo's* principle that suspects under interrogation are entitled to the assistance of counsel to assure effectuation of their Fifth Amendment privilege, *Miranda* effectively displaced *Escobedo's* rationale by assigning protection of the privilege to a newly created Fifth Amendment right to counsel rather than to the right to counsel secured by the Sixth Amendment. Kamisar, *supra* at

26. Then, in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the Court construed its earlier Sixth Amendment decisions to establish the principle that an accused "need not stand alone against the state at any stage of the prosecution, formal or informal, where counsel's absence might derogate from the . . . right to a fair trial." The Court indicated it would "scrutinize any pretrial confrontation" to determine whether the presence of counsel was "necessary to preserve the defendant's basic right to a fair trial." *United ed States v. Wade, supra,* 388 U.S. at 227, 87 S.Ct. at 1932.

Finally, in *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), in an opinion by Justice Stewart, a plurality of the Court declared that the Sixth Amendment right to counsel only attached "at or after the initiation of formal judicial criminal proceedings." *Id.* at 689, 92 S.Ct. at 1882. Adversary judicial proceedings can be commenced not only by way of indictment, but also "by way of formal charge, preliminary hearing . . . , information, or arraignment." *Id.*

This "modified indictment rule" seems now to be firmly established. *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), *Sixth Amendment Right to Counsel: Standards for Knowing and Intelligent Pretrial Waivers*, 60 B.U.L.Rev. 738 (1980), Grano, *Rhode Island v. Innis: A Need to Reconsider the Constitutional Premises Underlying the Law of Confessions*, 17 Am.Crim.L.Rev. 1 (1979), Kamisar, *supra* at 83.

■ In the present case petitioner was not under indictment and had not been charged with anything relating to the Joyce Hoff homicide. Petitioner had been arrested as a suspect in the Hoff homicide and for perjury and felony check charges which were pending against him. His claim, however, of a Sixth Amendment constitutional

rights violation relates only to the Hoff homicide questioning. Therefore, it is the opinion of this Court, based on the analysis set out above, that petitioner's Sixth Amendment right to counsel had not attached because adversary judicial proceedings in the form of indictment, formal charge, preliminary hearing, information, or arraignment in the Hoff homicide had not been commenced. Thus, petitioner's Sixth Amendment right to counsel was not violated.

## FIFTH AMENDMENT

The Fifth Amendment right to counsel attaches and comes into play when an individual is subjected to custodial interrogation because at such times the privilege against compelled self-incrimination is jeopardized. *Miranda v. Arizona, supra,* 384 U.S. at 477–78, 86 S.Ct. at 1629–30. Custodial interrogation was defined by the Court in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612.

Most recently, in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court further defined the term "interrogation" by holding that under *Miranda,* interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police know are reasonably likely to elicit an incriminating response from the suspect."

Petitioner in this case was questioned on three occasions: the morning of October 1, the afternoon of October 1, and during the car trip back to Sioux Falls on October 2.

There is little doubt that the questioning on October 1, both the morning and afternoon sessions, was custodial interrogation. Whether the conversations in the car on October 2 were interrogation presents a slightly closer question. This Court is convinced, however, that although petitioner classified the questioning in the car as statements and conversation, the questioning that took place was custodial interroga-

tion as defined in *Miranda* and *Innis.* Therefore, any information obtained during these *Miranda* interrogations is inadmissible at trial unless petitioner waived his right to the assistance of counsel.

## WAIVER

Permitting waiver of the right to counsel afforded by the Fifth and Sixth Amendments cuts against the Supreme Court's consistent recognition of the fundamental importance of counsel in the Constitution's scheme of justice. *See Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Nevertheless, the Court has long sanctioned waiver of the right to counsel noting that the "notion of compulsory counsel was utterly foreign" to the framers of the Constitution. *Id., Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In *Johnson* the Court established that "intentional relinquishment or abandonment of a known right or privilege" constitutes a valid waiver.

The Supreme Court in recent years, however, has developed a standard for waiver of the Fifth Amendment right to counsel which is less stringent than the standard for Sixth Amendment waivers.

In Fifth Amendment cases the Court seeks to ensure that statements obtained through the interrogation process are voluntary and not the product of coercion. The *Miranda* Court stated that the provision of the warning and relinquishment of the rights it delineated were "absolute prerequisites" to interrogation. The Court, however, clearly indicated that it did not intend to prohibit all police questioning conducted in the absence of counsel. *Miranda v. Arizona, supra,* 384 U.S. at 477–78, 86 S.Ct. at 1629–30. Rather, waiver of Fifth Amendment rights was possible once police had made those rights sufficiently known within the *Johnson v. Zerbst* framework. The Court acknowledged that an express indication of a desire to waive the *Miranda* rights followed closely by a statement could satisfy the relinquishment component for waiver. *Id.,* 384 U.S. at 475, 86 S.Ct. at 1628.

Recent decisions in *Tague v. Louisiana,* 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (per curiam), and *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), make clear that a suspect must affirmatively indicate that he comprehends the rights described to him in the warnings. He may then waive his Fifth Amendment rights by continuing to talk even though he does not "expressly state as much." *North Carolina v. Butler, supra* at 374, n. 4, 99 S.Ct. at 1757–58. Thus, the government can satisfy the *Johnson v. Zerbst* requirement for waiver of counsel in the context of a *Miranda* interrogation by proving that the suspect was informed of and comprehended his Fifth Amendment right to counsel.[1]

This Court now turns to an analysis of each of the custodial interrogation sessions to determine if petitioner waived his Fifth Amendment right to counsel.

### OCTOBER 1, 1973

### MORNING

■ Shortly after Green and Skadsen arrived to interrogate petitioner he was advised of his *Miranda* rights, indicated that he understood them and that he had no objection to speaking to officers without the presence of counsel. Petitioner did not make any incriminating statements during this morning session. It should be noted, however, that late in the morning session, petitioner, in response to a question on taking a polygraph examination stated, "that is a question I'd rather not answer until I talked to Steve." Questioning immediately

ceased and petitioner was returned to his cell at approximately 11:45 A.M. It appears from this that petitioner was informed of and comprehended his Fifth Amendment right to counsel and that the requirements of *Miranda, Tague* and *Butler* were satisfied. Therefore, this Court finds there was not a violation of petitioner's Fifth Amendment right to counsel at the morning session. Additionally, since petitioner did not make any incriminating statements at the morning session, further analysis is not necessary. The morning session remains relevant in the context of the "totality of the circumstances surrounding the interrogation." *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

### OCTOBER 1, 1973

### AFTERNOON

At approximately 4:30 P.M. Green and Skadsen returned to question petitioner. No *Miranda* warning was given at this time. The only possible incriminating statement made by petitioner at this session, however, was when petitioner was asked if Joyce Hoff's death was intentional or accidental. Petitioner indicated it was accidental and that he would rather not talk about it any more until he had talked with his attorney. Questioning of petitioner ceased.

■ The state contends that the warnings from the morning session carried over to the afternoon session and that a fresh set of *Miranda* warnings need not be given

---

1. The Court has also articulated the general *Johnson v. Zerbst* formulation in the context of waiver of the Sixth Amendment right to counsel. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Unlike waiver of the *Miranda* right to counsel, which requires simply comprehension of the right itself, waiver of the Sixth Amendment right to counsel requires comprehension of the risks of waiving the right and facing trial without counsel. *Id.* at 835, 95 S.Ct. at 2541.

The holdings of *Williams* and *Butler* also indicate that different standards govern the relinquishment of the Fifth and Sixth Amendment rights to counsel. *See Grano, supra* at 35, n. 215. The notion that the same waiver standard

should apply in both the Fifth and Sixth Amendment right to counsel cases was advanced by Justice White and rejected by the Court in *Williams. Brewer v. Williams, supra,* 430 U.S. at 435, n. 5, 97 S.Ct. at 1258 (White, J. dissenting). The fact that the *Butler* Court did not cite *Williams* further suggests that different waiver standards apply in the Fifth and Sixth Amendment contexts. *See also Edwards v. Arizona,* argument of counsel, 49 L.W. 1087, 3399 (1980).

In any event, since this Court has previously held that the Sixth Amendment right did not attach, only waiver in a Fifth Amendment context will be discussed further.

every time a question is asked. While this Court agrees that a new set of warnings need not be given every time a question is asked, it does feel that petitioner, at a minimum, should have been readvised of his rights before questioning was resumed at this afternoon session. *United States v. Gay*, 522 F.2d 429 (6th Cir. 1975), *United States v. Collins*, 462 F.2d 792 (2d Cir. 1972), *United States v. Jackson*, 436 F.2d 39 (9th Cir. 1970), Kamisar, *supra* at 72. Therefore, since this statement was admitted at trial, this Court must determine whether failure to exclude was reversible or harmless constitutional error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1976), and *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). All trial errors which violate the constitution do not automatically call for reversal. *Id.* Constitutional error that "affects substantial rights" of a party should not be treated as harmless. *Chapman v. California, supra,* 386 U.S. at 23, 87 S.Ct. at 827. Because the statement obtained in the afternoon session and admitted into evidence was, at worst, only marginally inculpatory and because of the existence of substantial other evidence on which to base a conviction, this Court holds that the admission into evidence of petitioner's statement obtained in the afternoon session was harmless beyond a reasonable doubt. There is sufficient evidence, beyond a reasonable doubt, to conclude that the constitutional error did not contribute to the conviction in any significant way. *Id.* at 24, 87 S.Ct. at 828.

### OCTOBER 2, 1973

Petitioner was picked up at the county jail the morning of October 2 for the purpose of transporting him back to Sioux Falls, a distance of some 600 miles. Petitioner was informed of his *Miranda* rights and indicated he understood them. He was then asked if he was willing to talk to police officers. Petitioner indicated he was willing by nodding his head forward. Questioning was then resumed for a period of about 20 minutes. Later that same day, however, but not in response to any questioning, petitioner made several statements (which were previously set forth in the facts) that were highly inculpatory and formed the primary basis of his conviction. The Court's inquiry now becomes whether this resumption of questioning violated petitioner's constitutional rights.

In *Miranda* the Supreme Court stated: Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice and producing a statement after the privilege has been once invoked. 384 U.S. at 473–74, 86 S.Ct. at 1627–28.

Subsequent to *Miranda*, however, the Supreme Court decided that neither this passage nor any other passage in *Miranda* created a per se proscription of indefinite duration upon further questioning by police. *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). *See also United States v. Marchildon*, 519 F.2d 337 (8th Cir. 1975), and *Hughes v. Swenson*, 452 F.2d 866 (8th Cir. 1971).

The Court in *Mosley* stated that: Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was scrupulously honored.'

Thus, *Mosley* stands for the proposition that interrogation may be resumed, at least in some limited circumstances. *Michigan v.*

**1324**

*Mosley, supra,* 423 U.S. at 106, 96 S.Ct. at 327.

██ While this Court feels it presents a close question whether defendant's Fifth Amendment right to counsel was violated by the resumption of questioning, it holds that the resumption of questioning on October 2 during the trip back to Sioux Falls did not violate petitioner's constitutional rights because of the presence of the following factors:

— previous interrogations were promptly terminated and petitioner's right to cut off questioning was 'scrupulously honored;'

— the questioning was resumed only after the passage of a significant period of time;

— petitioner was given the full and complete *Miranda* warning at the outset of the questioning on October 2 and said he understood them;

— petitioner when asked if he was willing to talk to police officers indicated a willingness to do so;

— petitioner did not at any time on October 2 assert or indicate that he did not want to talk to police officers or wanted to consult with counsel;

— the questioning on October 2 took place during an automobile trip and not in the police dominated atmosphere of a police station;

— petitioner was not being questioned at the time he made his incriminating statements, he volunteered them;[2]

— petitioner expressly waived his *Miranda* rights at one point by stating, "I don't give a damn what he says (his attorney). I'm doing anything I feel like and I'll talk to anybody I want to;"

— petitioner had been informed of his rights on several previous occasions, including by his attorney, and understood them as demonstrated by his previous invocations of his right to counsel and to cut off questioning;

— petitioner was knowledgeable of his constitutional rights from previous contacts with the criminal justice system;

— petitioner had consulted with his attorney and had been advised not to talk to law enforcement officers or make any statements until he was returned to Sioux Falls. Despite this advice from his own attorney, petitioner voluntarily chose to talk to law enforcement officers; and

— after the completion of the trip, petitioner called Skadsen to his cell and again made voluntary statements concerning the homicide.

It is the holding of this Court that the statements made by petitioner and obtained through the interrogation process on October 2, 1973, were voluntary and not the product of coercion. Petitioner was informed of and comprehended the rights described to him in the *Miranda* warnings and waived, both expressly and impliedly from the totality of the circumstances surrounding the interrogation, his Fifth Amendment right to counsel. *Tague v. Louisiana, supra, Fare v. Michael C., supra,* and *North Carolina v. Butler, supra.*

## II.

## OTHER CLAIMS

Petitioner also claims that his right to due process was violated by the admission into evidence of certain exhibits without proper foundation and that there was insufficient evidence to submit to the jury the charge of first degree manslaughter.

This Court finds petitioner's lack of foundation claim unpersuasive and without merit.

██ With respect to petitioner's sufficiency of the evidence claim this Court applied the test set out in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and finds that any rational trier of fact could have found the petitioner guilty

---

**2.** Petitioner did not classify any of the questioning that took place on October 2 as interrogation. Rather, he referred to the questioning as statements and conversation. If it is not considered interrogation in the eye of the beholder (petitioner), it is difficult to imagine that the "coercive pressure of the custodial setting" was present within the meaning of *Miranda.*

beyond a reasonable doubt. *See Jackson v. Virginia, The Advent of the Reasonable Doubt Standard in Habeas Corpus Proceedings,* 25 S.D.L.Rev. 372 (1980).

Accordingly, petitioner's application for a writ of habeas corpus is denied.

This decision constitutes the Court's findings of fact and conclusions of law pursuant to F.R.C.P. 52.