**Norman STUMES, Appellant,**

v.

**Herman SOLEM, Appellee.**

**No. 81–1589.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1981.

Decided March 1, 1982.

Rehearing and Rehearing En Banc Denied March 31, 1982.

---

D.R. 70.

Mark V. Meierhenry, Atty. Gen., Judith Atkinson, Asst. Atty. Gen. (argued), Pierre, S. D., for appellee.

Timothy J. McGreevy (argued), Dana, Golden, Moore & Rasmussen, Sioux Falls, S. D., for appellant.

Before HENLEY and ARNOLD, Circuit Judges, and HARRIS,* Senior District Judge.

ARNOLD, Circuit Judge.

Petitioner Norman Stumes appeals the decision of the District Court denying his petition for a writ of habeas corpus. Because the recent ruling of the Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), requires a different result, we reverse.

I.

We summarize the relevant facts of the case as detailed by the District Court in its opinion, reported at 511 F.Supp. 1312. There is little or no disagreement as to what happened.

On September 17, 1973, the body of Joyce Hoff was discovered in her apartment in Sioux Falls, South Dakota, the apparent victim of a homicide. During the investigation of the crime by Sioux Falls police, the petitioner became one of several suspects. At the time he had pending against him several unrelated charges. Petitioner was represented on one of the charges by Steve Jorgensen, a Sioux Falls attorney who had previously represented him on other matters. Petitioner's mother, upon learning that petitioner was being sought by police in connection with the homicide, contacted Jorgensen and retained him to represent her son.[1] Petitioner had not yet been formally charged with homicide in the death of Joyce Hoff.

After being retained by petitioner's mother, Jorgensen subsequently contacted Don Skadsen, Chief of Detectives with the Sioux Falls police, to tell him that he knew the police were looking for petitioner. According to Jorgensen's testimony at the evidentiary hearing in the District Court, he then struck a deal with the police under which, if petitioner contacted him first, he would persuade petitioner to surrender to police and, in turn, if the police found petitioner first, they would contact Jorgensen and permit him to talk to petitioner before they questioned him. Jorgensen stated that, as far as he was concerned, the police fulfilled their obligation under the agreement.

On September 27, 1973, petitioner was arrested in Green Bay, Wisconsin, on charges unrelated to the Hoff homicide. He was informed of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and placed in the Brown County Jail in Wisconsin to await transportation back to Sioux Falls. Jorgensen, his attorney, was subsequently notified of petitioner's arrest by Detective Skadsen. The morning after his arrest, petitioner telephoned Jorgensen, who told him not to make any statements to police until he had returned to Sioux Falls and discussed the matter with Jorgensen. Later that week, Jorgensen encountered Sergeant James Green of the Sioux Falls police out-

---

* The Hon. Oren Harris, Senior United States District Judge for the Eastern and Western Districts of Arkansas, sitting by designation.

1. In retaining Steve Jorgensen to represent petitioner, petitioner's mother paid Jorgensen the sum of $500.00.

side police department headquarters. Jorgensen informed Green that he had advised petitioner not to talk to the police but then added that, knowing Green, he would have a confession out of petitioner before he got him back to Sioux Falls.[2]

On September 30, 1973, police officers Skadsen and Green flew to Green Bay to bring petitioner back to Sioux Falls in order to stand trial on the other charges as well as for questioning in the Hoff homicide. That same day, Minnehaha County Deputy Sheriff Hendrick drove to Green Bay in a sheriff's automobile to be used in transporting petitioner to Sioux Falls.

On the morning of October 1, 1973, after executing a consent form for the search of his car and residence, petitioner was moved from the Brown County Jail to the Green Bay Police Department for questioning. While other police officers searched petitioner's car and room, Sergeant Green remained behind to question petitioner. After being advised of his rights at approximately 10:00 a.m., petitioner stated that he understood his rights and that he had no objection to speaking to police without the presence of his attorney. Green then proceeded over the course of an hour and a half to question petitioner about the death of Joyce Hoff. Petitioner, however, made no statements implicating himself in the homicide. A short time later, petitioner was asked by Green if he would submit to a polygraph examination on the Hoff case. Petitioner stated that he would rather not answer until he talked to his lawyer, Steve Jorgensen. Green stopped his questioning at this point, but told petitioner that officers would visit him again in the afternoon. Petitioner was then returned to the county jail at approximately 11:45 a.m.

Detectives Skadsen and Green revisited petitioner at about 4:30 p.m. No *Miranda* warning was given. Petitioner was asked about certain discovered evidence that placed him in Joyce Hoff's apartment on the day of her death. Petitioner admitted being in the decedent's apartment on September 17 and having intercourse with her at that time. He denied any responsibility for her death. After about half an hour of questioning, Green asked petitioner if Joyce Hoff's death was intentional or accidental. Green and Skadsen both testified that petitioner responded by saying it was accidental. Petitioner then stated, "I would rather not talk about it any more at this time until I talk to my attorney, and after that I'll give you a full statement in regards to her death." 511 F.Supp. at 1316. The questioning immediately ended.

Around 9:00 a.m. the next morning petitioner was taken from the county jail by Skadsen, Green, and Deputy Sheriff Hendrick and placed in the sheriff's automobile for the trip back to Sioux Falls. Shortly after the trip began, petitioner was informed of his *Miranda* rights and asked whether he understood them. Upon indicating his comprehension, petitioner was then asked by the police officers if he was willing to talk to them. Petitioner, according to the testimony of Skadsen and Green, shrugged his shoulders and nodded his head forward. He was then questioned about the death of Joyce Hoff. The discussion of the case did not go beyond questions previously asked of petitioner the day before at the county jail and lasted only fifteen or twenty minutes on that occasion.

It is 600 miles from Green Bay to Sioux Falls, and the trip took from about 9:00 a.m. to about 6:45 p.m. In addition to the questioning that took place at the beginning of the trip, there was "intermittent questioning" about the Hoff homicide "during [the] time period" of the trip. Tr. 85. Petitioner and the officers also engaged in general conversation. Approximately 90 miles from Sioux Falls, however, petitioner became emotional and stated that he "couldn't understand why anybody would want to kill Joyce and that the taking of a

---

**2.** During testimony at the evidentiary hearing before the habeas court, Jorgensen stated that his remark to Green was not "in a serious vein." Transcript of October 6, 1977, p. 13 (hereinafter cited as Tr.) Green testified in the suppression hearing prior to petitioner's trial in the state court that Jorgensen had told him that "he'd talked to [petitioner] on the telephone . . . and had advised him not to talk to us but he stated that if he did talk to us there wasn't anything he could do about it." 511 F.Supp. at 1315.

human life is so useless."[3] Sergeant Green then told petitioner that he would feel much better if he "got it off his chest." Petitioner stated that he had been wanting to tell somebody, but he just did not know how to go about doing it. He then proceeded, according to Skadsen and Green, to relate how he had killed Joyce Hoff on September 17, 1973.[4]

After petitioner had given his account of how Joyce Hoff died that night, Green asked him if he would be willing to give a statement to the police when they arrived in Sioux Falls. Petitioner agreed. At that point, according to Skadsen and Green, the following colloquy occurred:

Q. Your attorney will undoubtedly advise you not to give one (statement).

A. I don't give a damn what he says. I'm doing anything I feel like, and I'll talk to anybody I want to.

511 F.Supp. at 1317. Skadsen and Green testified that that was the first time during the day that petitioner had mentioned his attorney.

Petitioner and the police officers arrived at the Minnehaha County Jail in Sioux Falls around 6:45 p.m. A short time after petitioner was placed in his cell, he notified the jailer that he wanted to talk to Detective Skadsen. According to Skadsen, when he got to petitioner's cell, petitioner was sobbing. He then put his head on Skadsen's shoulder and said, "please tell them that I didn't mean to kill her, that it was an accident—that I'm not a vicious killer." *Ibid.*

Petitioner was subsequently charged with the murder of Joyce Hoff. Represented by appointed counsel, petitioner filed a motion to suppress all of the admissions on the ground that his constitutional rights had been violated. After a hearing, the motion was denied. A jury later convicted petitioner of first-degree manslaughter and

sentenced him to life imprisonment in the South Dakota State Penitentiary.

Petitioner appealed his conviction to the South Dakota Supreme Court, which remanded the case for findings of fact and conclusions of law on the suppression issue. (The trial court had simply denied the motion to suppress from the bench, without making findings for the Supreme Court to review.) *State v. Stumes*, 90 S.D. 382, 241 N.W.2d 587 (1976). The trial court was given the authority to make the determination whether petitioner's admissions were voluntary. On remand, the court so found, and petitioner's conviction was "automatically affirmed." 511 F.Supp. at 1318. Under this procedure, Stumes never got an appellate review in the state courts of the findings relevant to the suppression issue.

Petitioner sought a writ of habeas corpus in the District Court based on claims that had been previously raised and decided by the state courts. After holding evidentiary hearings and allowing the submission of additional evidence, the court found that "petitioner ha[d] established, pursuant to 28 U.S.C. § 2254(d)(3), by convincing evidence ... that material facts were not adequately developed at the state court hearing and the presumption of correctness does not apply." *Stumes v. Solem*, 511 F.Supp. 1312, 1319 (D.S.D.1981); see *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).[5] The District Court, however, ultimately rejected petitioner's constitutional claims and denied the writ of habeas corpus.

On appeal, petitioner contends that his right to counsel under the Fifth, Sixth, and Fourteenth Amendments was violated, and that his Sixth and Fourteenth Amendment rights were violated by the admission into evidence of certain exhibits and by the instructions given to the jury on the elements of the offense of first-degree manslaughter.

---

**3.** Petitioner's own account of this agrees with the testimony of Detectives Skadsen and Green. See 511 F.Supp. at 1316.

**4.** For a recitation of petitioner's statement as testified to by Sergeant Green, see 511 F.Supp. at 1316–17.

**5.** The State does not complain that the District Court erroneously failed to accord a presumption of correctness to the findings of the state courts.

## II.

### A.

Petitioner's initial constitutional claim rests on the accepted principle that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation. See *Miranda v. Arizona, supra.* It also has a basis in the Sixth Amendment's guarantee of the right to legal representation at the commencement of adversary judicial criminal proceedings. See *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The District Court held that petitioner's Sixth Amendment right to counsel was not violated because adversary judicial proceedings had not commenced. Because we hold that the admission at trial of petitioner's statements violated the Fifth and Fourteenth Amendments as construed in *Edwards v. Arizona, supra,* we need not decide the Sixth Amendment issue.

*Edwards* was decided after the District Court's opinion was filed. There, the defendant was the object of an arrest warrant charging him with robbery, burglary, and first-degree murder. Upon being arrested, he was taken to the police station and informed of his *Miranda* rights. Edwards stated he understood his rights and was willing to be questioned. During interrogation, defendant sought to "make a deal," but stated that he wanted an attorney before making a deal. At that point, the questioning ceased, and Edwards was returned to his cell. The next morning, two detectives showed up at the jail, wanting to see defendant. When told that the detectives were there, Edwards replied that he did not want to talk to anyone. The jail guard told defendant he "had to" see the detectives, who later questioned Edwards after first again informing him of his *Miranda* rights. During the course of questioning, defendant implicated himself in the crimes.

*Edwards* was convicted after evidence of his confession was admitted at trial. On appeal, the Supreme Court of Arizona affirmed, holding that defendant had waived his right to remain silent and his right to counsel by voluntarily giving his statement to police after being informed of his rights. The Supreme Court reversed, ruling that the use of Edwards's confession against him at trial violated his rights under the Fifth and Fourteenth Amendments. The Court stated:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.

101 S.Ct. at 1884.

The Court further held:

> [A]n accused, ..., having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchange or conversations with the police.

101 S.Ct. at 1885.

Applying *Edwards* to the specific facts of this case, we examine each of the custodial interrogation sessions.

### 1.

When petitioner was questioned on the morning of October 1, 1973, he was first advised of his rights by Sergeant Green. Petitioner stated he understood his rights and that he did not object to questioning without the presence of his attorney. No incriminating statements, however, were elicited from petitioner during this session. A short time later, when asked if he would submit to a polygraph test, petitioner stated that he would rather not answer until he talked to his lawyer. Questioning immediately ceased at this point. The District Court found that petitioner was adequately informed of and comprehended his Fifth Amendment right to counsel and that, therefore, no violation of petitioner's Fifth Amendment right to counsel occurred. Under the standard of *Edwards v. Arizona, supra,* we see no error in this ruling.

### 2.

On the afternoon of October 1, Detectives Skadsen and Green revisited petitioner. He was not given his *Miranda* rights again before questioning began. Petitioner admitted being in Joyce Hoff's apartment the day of her death and having intercourse with her. Additionally, he responded to a question about whether Joyce Hoff's death was accidental or intentional by saying it was accidental. Petitioner then stated that he would rather not talk about it any more until he had talked to his attorney. No further questions were then asked.

The District Court determined that petitioner should have been readvised of his rights before questioning was resumed at the afternoon interrogation session. The court concluded, however, that failure to exclude petitioner's statement at trial because of this defect was harmless constitutional error. Petitioner's statement that the death had been accidental was his first admission implicating himself in the homicide. We need not decide whether the admission of this statement alone would have been harmless error, however, because, for reasons to be discussed shortly, we take the view that use against petitioner of both his subsequent statements was also error. There can be no doubt that admission of these three statements was not harmless beyond a reasonable doubt. They were an important part of the State's case.

### 3.

On the morning of October 2, 1973, petitioner was transported from the county jail to Sioux Falls. During the trip, petitioner was informed of his *Miranda* rights and stated that he understood them. The police officers then asked him if he was willing to talk to them, and petitioner responded by shrugging his shoulders and nodding his head forward. He was then questioned for about twenty minutes about Joyce Hoff's death. Questioning continued intermittently during the trip. Later in the day, before petitioner's arrival in Sioux Falls, he "broke down" and made several highly incriminating statements, which formed the primary basis of his conviction.

The District Court, although noting that the facts presented a close question of whether petitioner's Fifth Amendment right to counsel was violated by the presumption of questioning, held that because of several factors [6] the resumption of questioning did not violate petitioner's constitutional rights. The Court concluded the petitioner's statements were voluntary and not the product of coercion and held that petitioner had "waived, both expressly and impliedly from the totality of the circumstances surrounding the interrogation, his Fifth Amendment right to counsel." *Stumes v. Solem, supra,* 511 F.Supp. at 1324.

▮ Despite the factors relied on by the District Court, our decision is controlled by *Edwards v. Arizona, supra.* Under *Edwards,* once petitioner had invoked his right to counsel, the resumption of questioning violated his constitutional rights. At the end of the day on October 1, petitioner stated that he would rather not talk any more about Joyce Hoff's death until he spoke with his attorney. The police officers, although ending their questioning at that time, resumed interrogation of petitioner the next morning during the trip to

---

**6.** Among the factors considered by the District Court were:

    (1) previous interrogations were promptly terminated and petitioner's right to cut off questioning was "scrupulously honored;"

    (2) questioning was resumed only after the passage of a significant period of time;

    (3) petitioner was given the full and complete *Miranda* warning at the outset of questioning on October 2 and said he understood it;

    (4) petitioner when asked if he was willing to talk to police officers indicated a willingness to do so;

    (5) petitioner did not at any time on October 2 assert or indicate that he did not want to talk to police or wanted to consult with counsel.

See 511 F.Supp. at 1324. The District Court also thought the questioning in the automobile did not occur in a "police dominated atmosphere." *Ibid.* We respectfully disagree. Petitioner was under arrest, being returned to Sioux Falls for prosecution, and in the custody of three police officers.

Sioux Falls. This action was impermissible. Petitioner had "expressed his desire to deal with the police only through counsel," and he "[wa]s not subject to further interrogation by the authorities until counsel ha[d] been made available to him." *Edwards*, 101 S.Ct. at 1885.

As the District Court noted, only the "intentional relinquishment or abandonment of a known right or privilege" constitutes a valid waiver. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In *Edwards*, the Supreme Court held that a valid waiver of the right to counsel cannot be established by showing only that petitioner responded to further police-initiated custodial interrogation, even if he has been advised of his *Miranda* rights. 101 S.Ct. at 1884. Petitioner's remark about taking a human life was not the initiation by him of renewed conversation on the subject of the homicide. It came only after he had been questioned intermittently during the trip, and it led to the crucial admission only after the officer seized on the opportunity to urge petitioner to get the matter off his chest.

The dissenting opinion would distinguish *Edwards* on the theory that Stumes's remark about taking a human life was the initiation of renewed conversation on the subject of the homicide. We respectfully disagree. We do not regard petitioner's remark as the beginning of a new conversation. Skadsen testified that "during that time period," that is, during the entire trip, "there was intermittent questioning of Norman Stumes," and that "the conversation, although initially it involved Joyce Hoff, it drifted back and forth." Tr. of Oct. 6, 1977, p. 85. Although Stumes testified that there was only "general conversation," *post*, p. 17, after lunch, as opposed to "interrogation," it is reasonably clear from Captain Skadsen's account that this "general conversation" included conversation about the crime. Stumes's statement that he would talk to the officers despite his attorney's advice to the contrary seems to have come *after* he had made his damaging admissions.

It is true that in *Edwards* the defendant was told that "he had" to talk with the detectives. 101 S.Ct. at 1882. But that fact was not essential to the Court's rationale, (though the Chief Justice, concurring in the judgment, thought it dispositive, 101 S.Ct. at 1886–87). The Court's reasoning was simply that once a defendant has invoked his right to counsel he may not again be questioned unless he himself initiates the further communication with the police. Edwards's admissions were excluded even though he was again informed of his *Miranda* rights (as Stumes was not on the afternoon of October 2), and even though he was "willing to talk," 101 S.Ct. at 1882, and told the officers "'I'll tell you anything you want to know,'" *ibid.* Perhaps petitioner's statement was "voluntary," in the sense that it was not coerced, but under *Edwards* that is not enough. See *id.* at 1884. It must also be apparent that the prisoner has knowingly and intelligently relinquished his right to counsel. In our view, when this case is judged by the *Edwards* standard, such a waiver cannot be said to have occurred. It is worth repeating that Stumes's request for counsel was neither generalized nor abstract. His mother had retained counsel for him, it was this particular lawyer whom he wished to consult, and the police knew not only that this lawyer had been retained, but also that he had advised Stumes to exercise his constitutional right of silence.

### 4.

Upon arrival at the Minnehaha County Jail on the evening of October 2, petitioner requested to speak to Detective Skadsen and subsequently made further inculpatory statements to him. This incident presents us with a close question. Viewed in isolation, it may fall within the exception expressed in *Edwards* where an accused himself has initiated further conversation with the police. Considering, however, the "totality of the circumstances" surrounding the various interrogations, *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979), we conclude that if it had not been for the improper questioning of petitioner by the police officers after

petitioner had invoked his right to counsel, his initial highly incriminating statements would not have been made. And probably petitioner would not have asked to talk to Detective Skadsen, further implicating himself in the crime, if those earlier inculpatory statements had not already been elicited. The connection between the improper interrogation and the final incriminating statement is not "so attenuated as to dissipate the taint." *Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (citing *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)).

### B.

We mention petitioner's other claims only because they might arise again if the State tries him a second time, as it is free to do. We have examined these arguments—that certain physical exhibits were unconstitutionally admitted, and that the evidence of first-degree manslaughter was so slight as to be constitutionally deficient—and hold that they are without merit.

### III.

The judgment is reversed, and the cause remanded to the District Court, with directions to issue the writ discharging Stumes from custody unless the State commences proceedings to try him again within such reasonable time as the District Court may fix.

It is so ordered.

HENLEY, Circuit Judge, dissenting.

I disagree with the majority that *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), requires reversal. The crucial issue appears to be the admissibility of the statements made by Stumes during the final miles of the trip from Green Bay to Sioux Falls. Although I agree with the majority that Stumes, while riding in a police car for five hundred or six

hundred miles [1] with three law enforcement officers, was in a police-dominated atmosphere, there is no indication that he was coerced into talking about the murder. On the contrary, there is every indication that he understood his rights and voluntarily chose to discuss the matter.

*Edwards* does not bar further interrogation if "the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 485, 101 S.Ct. at 1885. The preliminary question, then, is whether Stumes' statement about taking a human life constitutes an initiation of further communication. I think that it does. The trip from Green Bay to Sioux Falls began sometime about 9:00 a.m. It appears from the evidence that the travellers stopped for lunch about 2:00 p.m. at some point approximately two hundred fifty miles from Green Bay. Stumes made his statement about taking a human life some sixty to ninety miles outside of Sioux Falls, where they arrived at about 6:45 p.m. At the outset of the trip, Stumes was given *Miranda* warnings and questioned for only a few minutes. While there is some indication that Stumes was questioned "intermittently" during the trip, Stumes testified that there was no interrogation right after lunch. He said only that there was general conversation up to the time he made the statement in question and indeed it appears that there had been no conversation at all for perhaps ten or fifteen minutes before Stumes spoke. Officer Green recalled nothing Stumes had said after the lunch stop and prior to the confession other than voicing a complaint about his back hurting. According to Officer Green "we all were getting a little tired riding by that time." Thus, it is clear that no memorable mention of the crime occurred from the time of the stop for lunch until Stumes admittedly initiated a conversation. Stumes recounted the beginning of the conversation by testifying "I had a little conflict with my emotions and I made a

---

1. There is record support for the finding of the district court and the majority here that it is six hundred miles from Green Bay to Sioux Falls. However, Officer Skadsen testified in 1977 that the distance is "around five hundred miles." Current highway maps reflect that the distance by interstate highway is about five hundred miles. For at least some portion of the journey no interstate highway was being used; indeed the record does not reflect whether an interstate highway was in existence in 1973 when the journey was made.

statement that I couldn't understand why anybody would want to kill Joyce and that the taking of a human life is so useless." 511 F.Supp. at 1316.

In all the circumstances of the case, including the time factors,[2] it seems clear, even assuming *arguendo* that some of the earlier questioning may have been suspect, that Stumes' statement was not a result of any interrogation but was, on the contrary, a voluntary initiation of further communication.

Once it is determined that Stumes initiated further communication, the next question is whether he was subjected to subsequent interrogation, and, if so, whether he knowingly and intelligently waived his right to counsel and his right to silence. *Edwards v. Arizona,* 451 U.S. at 486 n.9, 101 S.Ct. at 1885 n.9. Assuming that telling Stumes he would feel better if he "got it off his chest" amounted to interrogation, the evidence indicates, as the district court found, that Stumes fully understood his rights and voluntarily waived them.[3] He had received *Miranda* warnings several times and his attorney had advised him by telephone not to talk to anyone. After Stumes' "little conflict with his emotions" prompted him to speak, he said that he had been wanting to tell someone about the incident. And, in response to Green's warning that his attorney would advise him not to make a statement, Stumes said that he would talk to anyone he wanted to. This is clearly distinguishable from *Edwards*, wherein the defendant stated that he did not want to talk to anybody but was told that he "had to." After all, as Justice Powell observes in his concurring opinion in *Edwards*, "[i]t is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk." 451 U.S. at 490, 101 S.Ct. at 1888.

Having concluded that Stumes' statements during the trip are admissible, I have little difficulty concerning the other two statements in question. Stumes clearly and voluntarily initiated the meeting with Skadsen in Sioux Falls during which he asked Skadsen to "tell them" that he was not a vicious killer. And finally, I agree with the district court that to the extent the admission of Stumes' statement made the afternoon before the trip was error, it was harmless in view of the seriousness of his later statements.

Although the district court did not have the benefit of the *Edwards* opinion, I believe that the result reached by the district court is not inconsistent with *Edwards* and is correct. I would therefore affirm the denial of the petition for a writ of habeas corpus.

**2.** Testimony on behalf of the appellee reflects that Stumes' statement was made "around" Jackson, Minnesota, some ninety miles from Sioux Falls. Stumes placed the conversation between Jackson and Worthington, which from maps appears to be about sixty miles from Sioux Falls. Thus, the conversation probably occurred no more than about one and one-half hours prior to the arrival time at Sioux Falls, 6:45 p.m., and more than three hours after the lunch stop at 2:00 p.m.

**3.** Stumes was no novice in dealing with courts, police officers and attorneys. He had been involved in some civil proceedings, in various misdemeanors and in two felony charges against him.