UNITED STATES of America, Appellee,

v.

James W. TURPIN, Appellant.

No. 81–2437.

United States Court of Appeals,
Eighth Circuit.

Submitted May 21, 1982.

Decided Jan. 18, 1983.

Murry A. Marks, J.D., Clayton, Mo., for appellant.

Thomas E. Dittmeier, U.S. Atty., Timothy J. Wilson, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before ROSS and McMILLIAN, Circuit Judges, and ALSOP,* District Judge.

McMILLIAN, Circuit Judge.

James W. Turpin appeals from a final judgment entered in the District Court [1] for the Eastern District of Missouri upon a jury verdict finding him guilty of attempting to make the track and other railroad property hazardous to work and use, with the intent to derail, disable, and wreck a train, in violation of 18 U.S.C. § 1992. The district court sentenced appellant to five years imprisonment. For reversal appellant argues, *inter alia,* that the district court erred in failing to suppress certain statements. For the reasons discussed below, we remand to the district court for further findings.

On appeal we view the evidence in the light most favorable to the jury verdict. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). On Sunday, June 28, 1981, at about 2:15 a.m., an eastbound freight train hit a white Chevrolet Camaro parked across the south tracks at the Buttle Street crossing in Wyaconda, Missouri. Inside the car was the body of Steven Blake; Blake had been killed by a shotgun blast several hours before the colli-

---

* The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri. The district court referred the pretrial motions to United States Magistrate David D. Noce.

sion. According to the government's theory of the case, appellant had killed Blake, placed the body in the car, and then parked the car across the tracks, knowing that the car would be hit and demolished by a passing train, in order to conceal the cause of death.

The government presented the following evidence connecting appellant with Blake's death. The evidence was largely circumstantial. Blake and appellant had lived together in LaBelle, Missouri, for about five years. Three witnesses testified that Blake and appellant had argued violently several times during the spring and early summer of 1981 and that appellant had threatened to kill Blake during these arguments. Following an argument on Thursday, June 25, 1981, Blake left the house and stayed at his parents' house. Blake owned a white Camaro. On Saturday, June 27, 1981, appellant telephoned Blake; Blake agreed to move back to LaBelle and did so that afternoon. According to the government's theory of the case, Blake and appellant argued again Saturday night; appellant shot and killed Blake in the house, placed the body in the white Camaro, drove to the Buttle Street crossing in Wyaconda, and parked the car across the tracks. The engineer of a westbound freight train which passed through Wyaconda at about 12:40 a.m. testified that he saw a white Camaro parked near the tracks, that two persons were seated inside the car, and that the car lights turned on as the train approached the crossing. Another witness testified that he saw a white Camaro at the crossing at about 2:05 a.m.

The engineer of the train involved in the collision testified that, as the train approached the crossing, he saw a white car cross the north tracks and then stop across the south tracks, directly in the path of the train. The driver of the car ignored the warning whistle. As soon as the engineer realized that the car was not going to move off the tracks, he activated the emergency brake. The train was going about 30 m.p.h. because the south tracks were under repair and subject to a speed restriction. The train hit the car on the passenger side and

dragged the car several hundred feet beyond the crossing. The car was severely damaged; however, the damage would have been much more extensive if the train had been going at its normal speed of 65–70 m.p.h. The engineer further testified that, immediately before the collision, he saw a man crouching by the front and side of the car jump up and run off. The engineer was unable to identify the man but described him as white, of medium height and build, with dark medium length hair, wearing a dark red shirt and jeans.

Another witness testified that during the evening of June 27 he saw appellant wearing a dark red shirt and jeans and noticed a white Camaro parked near appellant's house. Another witness, Stanley McReynolds, who lives midway between LaBelle and Wyaconda, testified that at about 5:15 a.m. on June 28 he was awakened by appellant's knocking on the door. Appellant was wearing a dark red shirt and jeans and told McReynolds his truck had broken down and that he wanted a ride home. McReynolds further testified that he heard about the train collision on his scanning radio earlier that morning and told appellant that Blake had been in some kind of train accident, but appellant showed little surprise. McReynolds also testified that he dropped appellant off near appellant's house and then looked for appellant's truck without success.

At about 7:30 a.m. Sunday, Missouri State Highway Patrol Sargent Schroeder and Lewis County Sheriff Whitmer went to appellant's house. They did not have a search warrant. They knew that Blake had been killed before the train accident and that Blake had lived with appellant. They suspected that appellant might have been involved in Blake's death. As they approached the side door, they noticed what appeared to be blood stains on the wooden floor of the porch. When appellant answered the door, the officers told appellant that Blake had been in a train accident and wanted to talk to appellant. Appellant told them to come in. As they entered the house, Schroeder noticed what appeared to be blood stains on a stove and on a rug by

the door. The officers then told appellant that there had been a train accident, that Blake was dead, and that he had probably been killed before the collision. At this point Schroeder read the *Miranda* warnings[2] to appellant; appellant stated that he understood the warnings and agreed to talk to the officers. Appellant made a brief statement.

The officers then asked appellant for permission to search the house. Appellant wanted to know why they wanted to search; the officers told him that they had seen what appeared to be blood stains on the rug near the door and on the porch and believed that it was possible that Blake had been killed in the house. Appellant stated that he would have to talk to his attorney first. Appellant then locked the house and Whitmer drove appellant to his parents' house, where appellant telephoned his attorney. Schroeder remained outside appellant's house. Appellant, his parents, and Whitmer returned to appellant's house at about 9:30 a.m. Appellant orally gave the officers permission to search and also signed a consent to search form. The search took less than an hour; the officers collected several blood and tissue samples from the house and yard. After the search was completed, Schroeder asked appellant several questions. Appellant answered the questions.

Expert medical evidence established that the cause of Blake's death was a shotgun wound in the head, that Blake had been killed several hours before the train accident and that the blood found in appellant's house was human and was probably Blake's.

Appellant argues, *inter alia,* that the district court erred in refusing to suppress the statements he made after the search. Before the search appellant told the officers that Blake had returned to the house Saturday afternoon, but left with another man later that afternoon, returned again about 11:00 p.m., but then immediately drove off again in the white Camaro. Appellant also told the officers that he was at home all Saturday night and left the house only briefly to go to his parents' house. After the search, in response to police questioning, appellant denied killing Blake and attributed the blood stains to a cut on the knee Blake suffered during a fight between Blake and appellant earlier that week. The government characterized these statements as false exculpatory statements.[3] Appellant argues that the statements were the product of custodial interrogation, conducted without the presence of counsel, in violation of the fifth amendment, citing *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Fields v. Wyrick,* 682 F.2d 154 (8th Cir.), *rev'd,* —— U.S. ——, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam).

Although appellant was not in custody at the time he made· the first statement, Schroeder gave him the *Miranda* warnings. Appellant indicated that he understood these rights and agreed to talk with the officers about his activities on Saturday. The district court found that, under the totality of the circumstances, appellant made a voluntary, knowing and intelligent waiver of his right to have counsel present. *See North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Appellant was informed, perhaps prematurely,[4] of his *Miranda*

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). The officer read the following familiar warning to appellant:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.

**3.** Expert medical evidence revealed no cuts or injuries on Blake's leg.

**4.** "The warnings mandated by *Miranda* must be given only when there is a custodial interrogation." *United States v. Jones,* 630 F.2d 613,

rights, including the right to remain silent, to consult with an attorney, and to have counsel present during interrogation. *See* note 2 *supra*. Appellant understood these rights and agreed to talk. Appellant did not ask to talk with his attorney at this time. Nothing in the record suggests that appellant lacked the mental capacity[5] to intelligently waive his rights; was under the influence of drugs; or was coerced, threatened, mistreated, or promised anything by the officers.

■ The district court found that appellant made the second statement voluntarily, but did not address the question of whether Schroeder's resumption of questioning, following appellant's request to talk to his attorney, violated *Edwards v. Arizona.* This is due, in large part, to appellant's failure to precisely phrase the issue below or cite *Edwards* to the district court. In his pretrial suppression motion, however, appellant argued generally that his statements were made in violation of his right to counsel, citing the fifth and sixth amendments,[6] and in his reply brief on appeal expressly cited *Edwards* and *Fields v. Wyrick,* a recent Eighth Circuit opinion discussing the right to counsel and *Edwards. See* 682 F.2d at 158, *citing* 451 U.S. at 486, 101 S.Ct. at 1885. Counsel for appellant also expressly raised the right to counsel issue and *Edwards* during oral argument. Under these circumstances we are reluctant to find that appellant waived appellate review.

In *Edwards v. Arizona* the defendant had been arrested, taken to the police station and read his *Miranda* rights. The defendant indicated that he understood his rights and agreed to talk to the police; the defendant wanted to make a deal but stated he wanted an attorney before proceeding. At that point the police stopped the ques-

tioning. The next day the police returned to question the defendant. Although the defendant stated that he did not want to talk to anyone, the defendant was told by the police that he "had to" see them. At that point the defendant had not yet consulted with an attorney. The police read the defendant his *Miranda* warnings again and proceeded to interrogate him; the defendant then made an inculpatory statement. The Supreme Court held that the admission of the inculpatory statement at the defendant's trial violated the fifth and fourteenth amendments. The Court held that

when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

. . . We . . . emphasize that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.

451 U.S. at 484–85, 101 S.Ct. at 1884–1885 (footnote omitted).

■ As noted earlier, the district court did not determine whether appellant was in custody at the time he made the second statement. Because *Miranda,* and by extension *Edwards,* applies only when there is

---

615 (8th Cir.1980) (per curiam). Both statements in the present case involved interrogation, that is, comments "reasonably likely to elicit an incriminating response from the subject." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted). The critical question is whether the interrogation was conducted in a custodial setting. *E.g., United States v. Jones,* 630 F.2d at 615–16.

5. Appellant is an adult of normal or above normal intelligence, a high school graduate, and successful auctioneer and dogbreeder.

6. The Supreme Court did not reach the sixth amendment claim in *Edwards v. Arizona,* 451 U.S. 477, 480 n. 7, 101 S.Ct. 1880, 1882 n. 7, 68 L.Ed.2d 378 (1981).

a custodial interrogation, *see Edwards v. Arizona,* 451 U.S. at 486, 101 S.Ct. at 1885; *United States v. Jones,* 630 F.2d 613, 615 (8th Cir.1980) (per curiam), we remand to the district court to determine whether appellant was in custody at the time he made the second statement.[7]

Accordingly, we remand to the district court for further findings. We retain jurisdiction of the appeal.

**7.** It is clear that the second statement involved "interrogation," *see Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); *United States v. Thierman,* 678 F.2d 1331, 1333–35 (9th Cir.1982); *United States v. Hackley,* 204 U.S.App.D.C. 221, 636 F.2d 493 (1980), resumed after appellant invoked his right to counsel, and thus was not "initiated" by appellant, *see Edwards v. Arizona,* 451 U.S. at 485, 101 S.Ct. at 1885; *Stumes v. Solem,* 671 F.2d 1150, 1156–58 (8th Cir. 1982); *United States v. Gordon,* 655 F.2d 478, 485 (2d Cir.1981). Appellant's request to talk to his attorney, which was granted by the officers, constituted a clear assertion of his right to counsel before further interrogation. *See Stumes v. Solem,* 671 F.2d at 1155–56; *Silva v. Estelle,* 672 F.2d 457, 458–59 (5th Cir.1982); *United States v. Hinckley,* 672 F.2d 115, 120 (D.C.Cir.1982). *But cf. Jordan v. Watkins,* 681 F.2d 1067, 1072–74 (5th Cir.1982) (defendant's request for appointment of counsel to assist him in "further judicial proceedings," made at arraignment, held not to constitute request for counsel for purposes of subsequent custodial interrogation where, after repeated *Miranda* warnings, defendant confessed and did not request counsel or attempt to cut off questioning).